OPINION
{¶ 1} Defendant-appellant, Peter Wolf Marder, appeals a decision of the Clermont County Court of Common Pleas, Domestic Relations Division, regarding the set-off he is to receive from his child support obligation as a result of Social Security payments made to his son, and ordering an upward deviation of his child support obligation.
 {¶ 2} Peter Marder and plaintiff-appellee, Sharron Marder nka Sharron Johnson *Page 2 
("Sharron"), were divorced in 1994. They have one child, Taylor, born in January 1991. Taylor is severely handicapped, was born with non progressive leukodystrophy of unknown etiology, and has sensory neural hearing loss and verbal apraxia.[1] Taylor has delayed gross and fine motor skills, learning disabilities, and abnormal sensory integration (meaning he has difficulty knowing where his body is in space). As a result of his disabilities, Taylor has significant tightness in his muscles and body which impairs his ability to walk and move; he has difficulty forming and pronouncing words; his hearing loss impacts his learning; and due to cognitive disabilities, it is difficult for him to care for himself in his daily life. It is unlikely that Taylor will ever live independently or be self-supporting.
 {¶ 3} Sharron provides continuous care for Taylor's extensive medical needs, coordinates all of his therapies, and is a dedicated "ongoing advocate in all areas of Taylor's life." Peter has not seen or communicated with Taylor (by phone or letter) since the divorce (with the exception of an inadvertent contact during his deposition) and has no intention of having a relationship with him. Both Peter and Sharron are remarried. Sharron does not work outside of the home, cares for Taylor on a full time basis, and cares for the daughter she has with her present husband (that child too has learning disabilities).
 {¶ 4} Peter was originally ordered to pay $ 489.60 per month in child support. By agreed entry filed in 2000, his child support obligation was increased to $ 1,400 per month. In 2002, following an investigative report by the Clermont County Child Support Enforcement Agency ("CSEA") showing he was in arrears in child support, Peter was ordered to pay $ 1,372.55 per month in child support and $ 274.51 per month in child support arrearages (for a monthly total of $ 1,674.51). *Page 3 
 {¶ 5} In December 2004, Peter requested a review of his child support obligation. In March 2005, the CSEA determined that an adjustment in Peter's child support obligation was not warranted (thus leaving his monthly obligation at $ 1,372.55). On October 4, 2005, Peter moved to adjust his child support obligation to give him credit for Social Security payments received by Sharron on behalf of Taylor as a result of Peter's retirement in 2001.
 {¶ 6} On April 25, 2006, based upon the Ohio Supreme Court's decision in Williams v. Williams, 88 Ohio St.3d 441, 2000-Ohio-375, the magistrate found that Peter was entitled to "a dollar-for-dollar credit against his child support obligation in the amount of the monthly Social Security benefit which the child is receiving." However, due to the fact that Sharron was potentially entitled to a child support deviation based on Taylor's disabilities (a matter which was to be heard in August 2006), the magistrate held in abeyance its determination as to the amount of credit due to Peter, if any, until after the August 2006 hearing. Peter filed objections to the magistrate's decision. The trial court found that pursuant to Williams, Peter was entitled to the credit. However, in light of the upcoming August hearing, the trial court ordered that the "setting [of] any credits" to Peter be held in abeyance until a decision was issued following the hearing.
 {¶ 7} As scheduled, the hearing was held in August 2006. On December 27, 2006, the magistrate partly denied Peter's motion to adjust his child support obligation and ordered an upward deviation of his child support obligation as follows:
 {¶ 8} "For the purpose of calculating child support, the Court finds that [Peter] earns income from his business in the amount of $ 48,000 annually, and that he has Social Security income in the amount of $ 11,459 annually. * * *
 {¶ 9} "The current child support requires [Peter] to pay child support in the amount of $ 1372.55 per month. * * * The Court finds, based on [Peter's] lack of parenting time and on [Sharron's] expenses that she incurs in caring for the parties' son's extraordinary needs, that *Page 4 
it is just, appropriate and reasonable to deviate from the actual annual obligation and order support in the amount of $ 1726.33 monthly.
 {¶ 10} "However, [Sharron] received $ 409 monthly in Social Security benefits for Taylor in 2005, and has received $ 434 monthly in Social Security benefits for Taylor in 2006. These are Taylor's benefits as a result of [Peter] receiving Social Security. As set forth [in April 2006], pursuant to Williams * * *, [Peter] is entitled to a dollar-for dollar credit as to the current obligation owed. Therefore, effective March 1, 2005, [Peter's] child support obligation shall be $ 1317.33 ($ 1726.33 minus $ 409) * * *. Effective January 1, 2006, [Peter's] child support obligation shall be $ 1292.33 ($ [1]726.33 minus $ 434) * * *.
 {¶ 11} "[T]he decision in Williams also dictates that [Peter] is entitled to a dollar-for-dollar credit as to the current obligation owed for the period represented by the lump sum payment and for any accumulated arrearage as of the date of that payment. However, in this case, the same bases for deviating from the actual annual obligation that existed in 2005 and that continue to exist, also existed in 2001, in fact, existed long before 2001. The equities of this situation dictate that [Peter] not receive a credit for the Social Security payments [Sharron] has received on the child's behalf since 2001."
 {¶ 12} Peter filed objections to the magistrate's decision which were overruled by the trial court. This appeal follows in which Peter raises six assignments of error.
 {¶ 13} Assignment of Error No. 1:
 {¶ 14} "THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY DENYING HIS MOTION TO ADJUST CHILD SUPPORT."
 {¶ 15} This assignment of error challenges the trial court's refusal to adjust Peter's child support obligation starting back to January 2001 to give him dollar-for-dollar credit for the Social Security payments received by Sharron on behalf of Taylor as a result of Peter's retirement in 2001. The record shows that Sharron received the following Social Security *Page 5 
payments: $ 4,500 in 2001; $ 4,620 in 2002; $ 4,680 in 2003; $ 4,776 in 2004; $ 5,092 in 2005; and $ 1,735 for the first four months of 2006. In October 2005, Peter moved to adjust his child support obligation to get credit for the Social Security payments received by Sharron since 2001. The trial court agreed to give Peter credit for 2005 and 2006 but declined to give him credit for the years 2001-2004 on equitable grounds.
 {¶ 16} Peter argues that by using equities, the trial court in essence retroactively modified his child support obligation for the years 2001-2004 even though no motion to modify child support was filed during those years. Peter argues that in doing so, the trial court abused its discretion and completely disregarded the supreme court's decision inWilliams, 88 Ohio St.3d 441.
 {¶ 17} The issue in Williams was whether a disabled parent was entitled to a credit against his or her child support obligation for Social Security payments made on a child's behalf as a result of the parent's disability, or whether the credit should be apportioned among both parents. The supreme court held that "a disabled parent is entitled to a full credit in his or her child support obligation for Social Security payments received by a minor child." Id. at 444. In so holding, the supreme court stated that "it is illogical to suggest that the granting of a credit will result in a windfall to the obligor and will penalize the child by providing that child with less money for his or her support. In essence, a credit for * * * Social Security benefits does not retroactively modify the disabled parent's monthly child support obligation; it merely changes the source of the payments." Id.
 {¶ 18} The supreme court then held that the father's child support obligation was to be set off by those Social Security payments received on behalf of his daughter. Because the amount of Social Security payments received on behalf of the daughter exceeded what the father owed, the supreme court ordered the trial court to enter judgment reflecting that no child support was owed from the time the daughter first received the Social Security benefits. *Page 6 
Id.
 {¶ 19} Although an appellate court generally reviews child support issues under an abuse of discretion standard, "where a trial court's order is based on an erroneous standard or a misconstruction of the law, it is not appropriate for a reviewing court to use an abuse of discretion standard. In determining a pure question of law, an appellate court may properly substitute its judgment for that of the trial court, since an important function of appellate courts is to resolve disputed propositions of law. * * * A trial court's purely legal determination will not be given the deference that is properly accorded to the trial court with regard to those determinations that are within its discretion."Slowbe v. Slowbe, Cuyahoga App. No. 83079, 2004-Ohio-2411, ¶ 43-45, citing Castlebrook, Ltd. v. Dayton Properties (1992),78 Ohio App.3d 340. We find that the trial court's application of Williams constitutes a mistake of law.
 {¶ 20} Subject to two exceptions, a trial court may not retroactively modify an existing child support order. R.C. 3119.83; Brittingham v.Brittingham, Brown App. No. CA2002-04-009, 2003-Ohio-812, ¶ 12. First, if the court determines that a child support order should be modified, it can make the modification order retroactive to the date the motion for modification was filed. R.C. 3119.84; Id. Second, the court may retroactively modify an existing child support order, even beyond the date the motion to modify was filed, upon discovering fraud perpetrated by the obligor. Id., citing Osborne v. Osborne (1992),81 Ohio App.3d 666.
 {¶ 21} In the case at bar, the trial court properly gave Peter credit, and adjusted his child support obligation, in 2005 and 2006 for the Social Security payments received by Sharron those two years. However, the trial court declined to give him credit for the years 2001-2004 because "the same bases for deviating from the actual obligation that existed in 2005 and that continue to exist, also existed in 2001, in fact, existed long before 2001." We agree with Peter that in refusing to give him credit for the Social Security payments received *Page 7 
by Sharron for the years 2001-2004, the trial court modified his child support obligation for these years, even though no motion to modify child support was ever filed. In doing so, the trial court violated R.C. 3119.83 and 3119.84. Further, the trial court acted in contravention ofWilliams.
 {¶ 22} In Williams, the supreme court clearly held that a parent is entitled to a full credit in his child support obligation for Social Security payments received by a minor child as a result of the parent's disability (or in this case, retirement). Williams,88 Ohio St.3d at 444. Prior to Williams, Ohio appellate courts were split on the issue. In reviewing the courts' divergent views, the supreme court cited a line of cases whose holdings were similar to the Williams holding. Among those cases was Pride v. Nolan (1987), 31 Ohio App.3d 261, which held: "Social Security payments received on behalf of a minor child as a result of a parent's disability may be credited toward that parent's support obligation commencing at such time as the benefit is received and not exceeding the monthly support obligation set forth in the decree of divorce." Id. at syllabus. See, also, Stephenson v. Stephenson (Mar. 18, 1996), Mahoning App. No. 94 CA 67 (although this case does not involve child support arrearage unlike Price, Social Security payments received on behalf of a minor child as a result of a parent's disability should be credited toward that parent's support obligation, commencing at such time as the benefit is received and not exceeding the monthly support obligation as required by the guidelines). As stated earlier, such credit does not constitute a retroactive modification of a child support order. Williams, 88 Ohio St.3d at 444.
 {¶ 23} In light of the language in Williams and Pride, we find that Social Security payments received on behalf of Taylor as a result of Peter's 2001 retirement must be credited toward Peter's support obligation, commencing at such time as the benefit was received, that is 2001. The trial court, therefore, erred in refusing to adjust Peter's child support obligation for the years 2001-2004 to give him credit for the Social Security payments *Page 8 
received by Sharron on behalf of Taylor during those years. We reverse the trial court's denial of Peter's motion to adjust and remand the cause to the trial court to credit Peter's child support obligation with those Social Security payments received on behalf of Taylor for the years 2001-2004. Peter's first assignment of error is sustained.
 {¶ 24} Assignment of Error No. 2:
 {¶ 25} "THE TRIAL COURT IMPROPERLY ADMITTED DEFENDANT-APPELLANT'S DISCOVERY DEPOSITION INTO EVIDENCE AND IMPROPERLY USED THE DISCOVERY DEPOSITION IN ARRIVING AT HER FINDINGS OF FACT AND CONCLUSIONS OF LAW."
 {¶ 26} Peter challenges the admission of, and the magistrate's reliance on Peter's deposition on the grounds that it was neither signed by him in violation of Civ. R. 30(E) nor filed in accordance with Civ. R. 32(A).
 {¶ 27} Civ. R. 30(E) states: "When the testimony is fully transcribed the deposition shall be submitted to the witness for examination and shall be read to or by the witness, unless examination and reading are waived by the witness and by the parties. * * * The deposition shall then be signed by the witness, unless the parties by stipulation waive the signing or the witness is ill or cannot be found or refuses to sign. If the deposition is not signed by the witness within seven days of it submission to the witness, or within such longer period, not exceeding [28] days, to which the parties agree, the officer shall sign it and state on the record the fact of the waiver or of the illness or absence of the witness or the fact of the refusal to sign together with the reason, if any, given thereof; and the deposition may then be used as fully as though signed[.]"
 {¶ 28} Civ. R. 32(A) in turn states: "Every deposition intended to be presented as evidence must be filed at least one day before the day of the trial or hearing unless for good cause shown the court permits a later filing."
 {¶ 29} Peter was deposed in January 2006. At the conclusion of the deposition, *Page 9 
neither party inquired as to whether Peter wished to waive the reading and signing of his deposition, nor did either counsel waive that requirement. The deposition was never signed by Peter and was not filed before the August 2006 hearing. During the hearing, which lasted two days, Sharron referred to the deposition several times during Peter's cross-examination. Peter never objected to the fact that the deposition was neither signed nor filed, and never objected to its use during the hearing. The record shows that on the second day of the hearing, and after the hearing was concluded, the magistrate sua sponte filed the deposition. Then, in a decision filed two days later, the magistrate ordered the parties to (1) submit any written objections to the admission of either party's exhibits, and (2) file the transcript of Peter's deposition by September 6, 2006 to preserve the record. Neither party filed the deposition. In its written objections to Sharron's exhibits, Peter never referred to the deposition. It was not until Peter filed objections to the magistrate's December 2006 decision (five months after the August 2006 hearing) that Peter objected to the magistrate's use of the deposition.
 {¶ 30} It is well-established that the failure to draw a trial court's attention to a possible error, by objection or otherwise, when the error could have been corrected, results in a waiver of the issue. SeeMoser v. Moser, Warren App. No. CA2005-09-109, 2006-Ohio-5381. The Civil Rules also provide for waiver of an error if an objection is not timely made. Civ. R. 32(D)(4) specifically states that "[e]rrors and irregularities in the manner in which * * * the deposition is * * * signed, * * * filed, or otherwise dealt with by the officer under [Civ. R.] 30 and 31 are waived unless a motion to suppress the deposition or some part thereof is made with reasonable promptness after such defect is, or with due diligence might have been, ascertained."
 {¶ 31} A careful review of the record shows that Peter never moved to suppress the deposition as required under Civ. R. 32(D)(4), and did not timely object to the use of or *Page 10 
manner of filing the deposition or to the fact it was never signed. In light of the foregoing, we find no error in the filing and use of the deposition. See David Macpherson Assoc, Inc. v. Media MarketingAdvertising, Inc. (July 27, 1983), Clermont App. No. CA-1065. Peter's second assignment of error is overruled.
 {¶ 32} Assignment of Error No. 3:
 {¶ 33} "THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT IN ADMITTING INTO EVIDENCE, OVER DEFENDANT-APPELLANT'S OBJECTIONS, PLAINTIFF-APPELLEE'S TRIAL EXHIBITS [SIC]."
 {¶ 34} In this assignment of error, Peter challenges the admission of, and the magistrate's subsequent reference in its decision to a letter signed and purportedly written by Mark Shapiro, M.D., a neurologist at Cincinnati's Children's Hospital. Taylor has been a patient of Dr. Shapiro since 2002. The letter describes in length Taylor's numerous medical problems and learning disabilities, and emphasizes how certain medical equipment and his specific dietary regimen (comprised of expensive vitamins, supplements, and organic food) have been and are crucial to his health and cognitive development. Testimony at the August 2006 hearing indicated that the letter was written by Sharron, and reviewed, corrected, and signed by Dr. Shapiro who thought the purpose of the letter was to help Taylor get services.
 {¶ 35} One issue at the hearing was whether Taylor medically needed to be on this particular and expensive dietary regimen. Dr. Shapiro testified that he has no training in nutrition; Taylor has been on this diet since 1998; Dr. Shapiro did not prescribe the diet; there is an association between Taylor's diet and the improvement of the white matter in his brain, although there is no medical proof; Dr. Shapiro is concerned that if taken off of the diet, Taylor would not progress or perhaps would lose skills; the trial court should rely on his testimony; and "many things" in the letter were accurate.
 {¶ 36} The record shows that at a February 2006 hearing, the parties agreed to submit *Page 11 
the letter to the magistrate to support the issue that Taylor is severely handicapped. Peter's attorney then indicated: "All the other issues in [the letter], I probably wish to contest at some point." The letter was labeled Plaintiff's Exhibit 1. During the August 2006 hearing, the letter was introduced by Peter's attorney during Dr. Shapiro's cross-examination as Exhibit S (the letter and Exhibit S are identical). The letter was never objected to. During that hearing, a Plaintiff's Exhibit 1 was introduced. That exhibit included a company's analysis of Taylor's blood and a recommended dietary regimen.
 {¶ 37} In a pleading captioned "Exhibit List — Objections, Withdrawal and Motion to Admit," filed two weeks after the August hearing (and before the magistrate's December 2006 decision), Peter specifically stated he had no objection to Exhibit 1 and was withdrawing Exhibit S. The pleading does not indicate which Plaintiff's Exhibit 1 he is referring to.
 {¶ 38} In its December 2006 decision, the magistrate stated: "Based on [Peter's] Objections, * * * Plaintiff's exhibits [other than Exhibit 21] are admitted. [Peter] withdrew Exhibit S; the rest of [Peter's] exhibits are admitted. The Court notes that [Peter's] Exhibit S is the same document as Plaintiff's Exhibit 1 from the [February 2006] hearing. [Peter] did not object to the admissibility of that exhibit at the [February 2006] hearing. The Court will consider the exhibit, as it is part of the court record."
 {¶ 39} As noted earlier, the failure to draw a trial court's attention to a possible error, by objection or otherwise, when the error could have been corrected, results in a waiver of the issue. SeeMoser, 2006-Ohio-5381. Although Peter objected to the magistrate's December 2006 decision on the ground, inter alia, that it improperly used the letter beyond what was agreed during the February 2006 hearing, Peter did not then object to the admission of the letter. Nor did he object to the letter either at the February 2006 or August 2006 hearing. We decline to equate the statement "All the other issues in [the letter], I *Page 12 
probably wish to contest at some point," made during the February hearing, with an actual objection. Upon reviewing Dr. Shapiro's testimony and the magistrate's decision, and in light of Peter's failure to object to the admission of the letter, Peter's pleading filed with regard to the parties' exhibits, and the magistrate's brief and accurate references, in its decision, to the letter and Dr. Shapiro's testimony, we find that the magistrate did not err by admitting the letter and by referring to it in its decision. Peter's third assignment of error is overruled.
 {¶ 40} Assignment of Error No. 4:
 {¶ 41} "THE TRIAL COURT ERRED WHEN IT FAILED TO FOLLOW THE STATUTORY PROCEDURE FOR RECALCULATION OF CHILD SUPPORT."
 {¶ 42} Peter first argues that the magistrate erred by failing to follow R.C. 3119.79 when it recalculated Peter's child support obligation. Civ. R. 53 requires parties to make timely, specific objections in writing to the trial court, identifying any error of fact or law in the magistrate's decision. See Bamba v. Derkson, Warren App. No. CA2006-10-125, 2007-Ohio-5192. Civ. R. 53(D)(3)(b)(iv) states: "Except for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion * * * unless the party has objected to that finding of fact or conclusion of law under Civ. R. 53(D)(3)(b)." Peter did not object to the magistrate's failure to follow R.C. 3119.79 and does not claim plain error here. Peter is therefore precluded from raising this issue on appeal. See Bamba.
 {¶ 43} Next, Peter argues that the magistrate improperly relied on two exhibits submitted by Sharron, and in the process confused Taylor's medical needs with ordinary living expenses. At issue are Sharron's Exhibits 12 and 13 which listed Taylor's out of pocket medical expenses for 2005 and 2006 ($ 7,388.09 and $ 16,169.75 respectively). The expenses included the cost of Taylor's diet regimen, the cost of modifications to their home to address Taylor's physical disabilities, and the cost of physical therapy equipment and shoes. *Page 13 
Exhibit 13 also included an estate planning for $ 3,000, and an I-Communicator for $ 6,798. Peter challenges the fact that there was no expert testimony that the expenses in the exhibits were both "medical needs" and reasonable.
 {¶ 44} We note at the outset that Peter did not object to the exhibits when they were first introduced during Sharron's direct examination. Further, although Peter asserts that the magistrate improperly relied on them because there was no expert testimony, he cites no case law in support of his argument.
 {¶ 45} In its December 2006 decision, the magistrate found that based upon Peter's lack of parenting time and Sharron's expenses incurred in caring for Taylor's extraordinary needs, it was just, appropriate, and reasonable to deviate from Peter's then monthly child support obligation of $ 1,375.55. The magistrate cited R.C. 3119.23(A), (D), and (M). R.C. 3119.23 sets forth factors a trial court may consider in determining whether to grant a child support deviation. The factors cited by the magistrate include the special and unusual needs of the child; extended parenting time or extraordinary costs associated with parenting time; and the physical and emotional condition and needs of the child.
 {¶ 46} The magistrate further found, and the record supports the finding, that Sharron and her husband "have incurred a great deal of extra expenses purchasing extra equipment for Taylor, making modifications to their home, buying organic food, for medical expenses, etc., for total expenditures of $ 7400 to $ 16,200, due to meeting Taylor's extraordinary needs and expenses. [Sharron] presented a great deal of testimony regarding the time and effort she spends in caring for Taylor, arranging for his therapy, transporting him to/from appointments, etc. [Sharron] also presented a great deal of testimony regarding all of Taylor's disabilities and limitations."
 {¶ 47} In granting a child support deviation, the magistrate did not simply rely on Exhibits 12 and 13, but also relied on the extensive testimony from Sharron, Taylor's *Page 14 
pediatrician, and Taylor's neurologist regarding Taylor's needs and challenges, his progress in some areas, and how efforts and expenses spent on behalf of Taylor have positively helped him, and still help him, over the years. A review of the voluminous record clearly shows that Taylor has extraordinary needs and expenses which are always changing as Taylor grows up and faces new challenges. A review of the record does not support Peter's assertion that the magistrate confused Taylor's medical needs with ordinary living expenses. Accordingly, we cannot say that the magistrate erred in relying on Exhibits 12 and 13 in granting a child support deviation.
 {¶ 48} Finally, Peter argues that the magistrate erred by admitting Sharron's Exhibits 12 and 13. The two exhibits do not have any original documents and consist only of photocopies of receipts for Taylor's medical expenses. Peter asserts that under the best evidence rule, as codified under Evid. R. 1002, Sharron should have been required to produce the original receipts. During the August 2006 hearing before the magistrate, Peter did object to the use of the exhibits on that ground.
 {¶ 49} Evid. R. 1002 provides that "[t]o prove the content of a writing, * * * the original writing * * * is required, except as otherwise provided in these rules or by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio." Evid. R. 1003 provides exceptions to the requirement of producing original documents: "A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." Because Exhibits 12 and 13 consist of photocopies, they are duplicates as defined by Evid. R. 1001(4). SeeEnz v. Enz (June 5, 1998), Miami App. No. 97-CA-53.
 {¶ 50} The Staff Notes to Evid. R. 1003 indicate that a duplicate is the equivalent of an original, and hence, is the best evidence. Id. The party opposing the introduction of the *Page 15 
duplicate as the best evidence has the burden of proving that there is a genuine question as to the authenticity of the original or that it would be unfair to admit the duplicates. Enz; Natl. City Bank v. Fleming
(1981), 2 Ohio App.3d 50, 57. The objection must be something more than a frivolous objection. Id. The decision to admit a duplicate is left to the trial court's sound discretion, and unless it is apparent from the record that the trial court's decision is arbitrary or unreasonable, the determination will not be disturbed on appeal. Fleming at 57.
 {¶ 51} At the hearing, the magistrate overruled Peter's objection to the use of Exhibits 12 and 13 on the ground that "[w]e routinely in this Court all the time use copies. Both counsels know that. We use copies more than we use originals, time after time after time. * * * We don't take people's originals. So, overrule the objection." A review of the record shows that neither of the limitations in Evid. R. 1003 applied here. There was therefore no abuse of discretion.
 {¶ 52} Peter also contends Sharron did not comply with Evid. R. 1006[2] because although the listing at the front of Exhibits 12 and 13 was a summary of the medical expenses, it was not made available to him at a reasonable time or when the trial court ordered. We find that Evid. R. 1006 does not apply here. When the rule went into effect, it basically codified prior Ohio law which required that in order for a summary to be admissible, the documents upon which it is based must be either admitted or offered into evidence or their absence explained. SeeHorning-Wright Co. v. Great American Ins. Co. (1985),27 Ohio App.3d 261. During the hearing, Peter had at his disposition not only the listing but the duplicates of the receipts. In addition, Peter never objected to the use of Exhibits 12 and 13 on that ground. *Page 16 
 {¶ 53} Peter's fourth assignment of error is accordingly overruled.
 {¶ 54} Assignment of Error No. 5:
 {¶ 55} "THE MAGISTRATE ERRED [IN] FINDING DEFENDANT-APPELLANT'S SELF EMPLOYED INCOME TO BE $ 48,000 ON THE CHILD SUPPORT WORKSHEET."
 {¶ 56} The record shows that Peter has been self-employed in the publishing business for several years. From 2003 to 2005, his primary source of income came from selling advertisement in a publication he owns called Women's News. Peter's deposition indicates that in August 2005, Peter stated on a loan application that his monthly gross income was $ 4,000 (which would be $ 48,000 annually). By contrast, Peter's individual income tax returns for 2004 and 2005 list his annual income as $ 18,141 and $ 3,459 respectively, not including his social security income. In its decision, the magistrate found that for purposes of calculating child support, Peter "earns income from his business in the amount of $ 48,000 annually, and that he has Social Security income in the amount of $ 11,459 annually."
 {¶ 57} In this assignment of error, Peter argues that the trial court improperly used his deposition instead of his 2005 individual income tax return to determine his annual income; erroneously found that Peter failed to submit tax returns for his Subchapter S businesses; failed to consider the testimony of his certified public accountant who prepared his individual and Subchapter S corporation tax returns; and abused its discretion in using a gross income figure rather than his "self employment less expenses" incurred in generating the income shown in the Subchapter S corporation tax returns.
 {¶ 58} At the outset, we agree with Peter that the magistrate's finding that Peter did not submit tax returns for his Subchapter S businesses is incorrect. The record does include a 2004 tax return for Panoramic Publications, Inc, a Subchapter S corporation with an annual income of $ 28,141 (Peter's Exhibit H), and a 2005 tax return for Women's News, Inc., a Subchapter S corporation with an annual income of $ 3,459 (Peter's Exhibit I). *Page 17 
 {¶ 59} It is well-settled that a trial court's decision regarding a child support obligation will not be reversed on appeal absent an abuse of discretion. Foster v. Foster, 150 Ohio App.3d 298, 2002-Ohio-6390, ¶ 9. An abuse of discretion implies that the court's attitude was unreasonable, arbitrary, or unconscionable and not merely an error of law or judgment. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 60} For purposes of calculating child support, R.C. 3119.01(C)(5)(a) defines income in pertinent part as "[f]or a parent who is employed to full capacity, the gross income of the parent." "`Gross income' means * * * the total of all earned and unearned income from all sources during a calendar year, whether or not the income is taxable, and includes income from salaries, wages, * * * social security benefits, including retirement, * * * self-generated income; and potential cash flow from any source." R.C. 3119.01(C)(7).
 {¶ 61} "`Self-generated income' means gross receipts received by a parent from self-employment, proprietorship of a business, joint ownership of a partnership or closely held corporation, and rents minus ordinary and necessary expenses incurred by the parent in generating the gross receipts. `Self-generated income' includes expense reimbursements or in-kind payments received by a parent from self-employment, the operation of a business, or rents, including company cars, free housing, reimbursed meals, and other benefits, if the reimbursements are significant and reduce personal living expenses." R.C. 3119.01(C)(13).
 {¶ 62} In many cases, income for child support purposes is not equivalent to the parent's taxable income. Foster, 150 Ohio App.3d at ¶ 13. Indeed, "the purposes underlying the Internal Revenue Code and the child support guidelines are vastly different. The tax code permits or denies deduction from gross income based on myriad economic and social policy concerns which have no bearing on child support. The child support guidelines, in contrast, are concerned solely with determining how much money is actually available for child support purposes."Offenberg v. Offenberg, Cuyahoga App. Nos. 78885, 78886, *Page 18 
79425, 79426, 2003-Ohio-269, ¶ 29, quoting Helfrich v. Helfrich (Sept. 17, 1996), Franklin App. No. 95APF12-1599.
 {¶ 63} The record indicates that Peter is the sole officer and shareholder of Women's News, Inc., a Subchapter S corporation. As such, he has unlimited control over the distribution of the corporation's income and assets for tax and reporting purposes. Bowen v. Thomas
(1995), 102 Ohio App.3d 196, 201. Under these circumstances, a parent has a greater opportunity to manipulate his or her income because such income includes the retained earnings of corporation, depreciation of noncash items, and the costs of meals and trips paid for by the corporation. See Loeffler v. Loeffler (Nov. 20, 1998), Lucas App. No. L-97-1271.
 {¶ 64} "When a corporate proprietorship is involved in a child-support case, the court has the duty to carefully examine the evidence of corporate expenses and deductions as related to possible personal income. A review of all circumstances must be conducted `to determine if the individual proprietor has taken or concealed anything of value from his corporation which should be added to his personal income. The possibility of withdrawal of personal benefits from a closely held corporation for living expenses or other personal use requires sharp scrutiny of all available records to prevent avoidance of child support." Fledge v. Fledge, Butler App. No. CA2001-09-225, 2002-Ohio-6105, ¶ 11, citing Sizemore v. Sizemore (1991),77 Ohio App.3d 733.
 {¶ 65} When determining a parent's income for purposes of calculating child support, the following applies: "The parents' current and past income and personal earnings shall be verified * * * with suitable documents, including, but not limited to, paystubs, employer statements, receipt and expense vouchers related to self-generated income, tax returns, and all supporting documents and schedules for the tax returns." R.C. 3119.05(A). Federal and state tax documents provide a proper starting point to calculate a parent's income, but they *Page 19 
are not the sole or determining factor for the trial court to consider in finding what constitutes a parent's "gross income." Foster, 150 Ohio App.3d at ¶ 12.
 {¶ 66} As noted earlier, Peter submitted both his individual and Subchapter S corporation income tax returns for 2004 and 2005. We note that neither Peter's individual tax returns nor his Subchapter S corporation tax returns are signed by him, either in his individual capacity or as an officer of the corporation. Nor are they signed by his certified public accountant, Tara Hetzel, even though she prepared them. Although the 2004 and 2005 corporate tax returns list gross receipts of $ 212,790 and $ 133,318 respectively, these figures dwindle to $ 28,141 and $ 3,459 after subtracting the cost of goods sold and deductions. The record also includes for the year 2005 both a statement of assets, liabilities, and equity and a statement of revenues and expenses for Women's News, Inc. Both statements were prepared by Hetzel.
 {¶ 67} Hetzel explained how she prepared tax returns for Peter: "I receive bank statements which show deposits and * * * reductions in the checking account. The deposits are identified as either money that he's put into the company or that his personal deposits to the company or income to the company. The monies that come out of the checking accounts are described to me as either being personal or business in nature. * * * And then there may be other items which are not included on the checking account but which have a bearing on his corporate returns. For instance, he may have paid with his personal accounts some business expenses." Hetzel testified that when preparing the corporate tax returns, she goes through Peter's personal checking accounts to capture business expenses paid out of the personal checking account. Hetzel also testified that Peter's use of the business account to deposit personal income and withdraw money for personal expenses does not affect his individual or corporate tax returns, but merely creates a greater cash flow through the business account. *Page 20 
 {¶ 68} Accompanying the two 2005 statements regarding Women's News, Inc.'s assets, revenues, and expenses is a letter from Hetzel to the Board of Directors of Women's News, Inc. The letter states in pertinent part that: "I have compiled the accompanying statement of assets, liabilities, and equity-income tax basis of Women's News, Inc. * * * and the related statement of revenue and expense-income tax basis for each month and the year[.] * * * A compilation is limited to presenting in the form of financial statements information which is the representation of management. I have not audited or reviewed the accompanying financial statements * * *. Management has elected to omit substantially all of the disclosures ordinarily included in financial statements prepared on the income tax basis of accounting."
 {¶ 69} Peter's individual income tax return for 2005 lists his annual income from self-employment at $ 3,459, based upon the 2005 corporate income tax return. The latter return is itself based on the dollar figures set forth in the 2005 statement of revenues and expenses. It is not clear whether this 2005 statement qualifies as "receipt and expense vouchers related to self-generated income" under R.C. 3119. 05(A). What the record clearly shows, however, is that the 2005 statement was prepared by Hetzel solely based upon documents and financial statements provided by Peter, the sole officer and shareholder of the corporation.
 {¶ 70} There was very limited testimony as to Peter's annual income either in his deposition or during the 2006 hearing. Peter essentially testified that his only income, other than social security income, comes from selling advertisement in the Women's News newspaper; in support, he submitted his individual and corporate tax returns for 2004 and 2005 as well as Hetzel's testimony. Peter and his wife both testified that they have used the business bank account to pay for business expenses and personal expenses, including child support, utilities, and personal credit cards. Indeed, in his deposition, Peter testified that he had charged his trip from Florida (where he now lives) to Ohio for the deposition as a *Page 21 
business expense. During the hearing, while reviewing checks written by the parties, Peter was asked about a $ 7,000 check for cash. The check bore no notation and Peter had no idea what it was for. Likewise, in his deposition, Peter denied knowing anything about deposits of $ 3,222, $ 7,400, and $ 9,000, or where they came from.
 {¶ 71} Individual income tax returns for Patricia Marder, Peter's wife of ten years, list her gross income as $ 37,654.32 for 2004 and $ 40,935 for 2005. Peter and his wife own a $ 200,000 house (they still owe $ 148,680.24 on it), a 22' Wellcraft boat, a 1979 Mercedes, a 1993 Jaguar, and a 2002 Chrysler Sebring. Testimony at the hearing indicates that Peter goes to casinos four times a year; he and his wife took a cruise in 2004; they also took a five-day cruise in April 2006 which cost $ 2,413; they took the cruise with another couple and paid up front for that couple out of the business account; and Patricia had no idea what they did with the money when they were reimbursed by the couple.
 {¶ 72} In its decision, the magistrate found that the checks written from Peter and Patricia's personal checking account from January 2004 through March 2005 "indicate that the Marders write checks averaging $ 2565 monthly from that account, which includes church donations of at least $2100 annually. [Patricia's] wages are a net of $1220 bi-weekly, which is a net of $ 2646 monthly. [Peter] * * * and [Patricia] testified * * * that they pay other personal expenses from the business account[.] * * * [Peter's] professed knowledge about his personal and business financial affairs is so limited as to defy common sense. * * * [Peter] and his wife could not afford their expenses on her wages and [Peter's] $11,000 in business income and Social Security income. The Court finds that [Peter's] testimony was less than forthright and less than credible."
 {¶ 73} Peter objected to the magistrate's reliance on the deposition and its determination that Peter's annual gross income was $ 48,000. The trial court overruled the objection, stating: "[Peter] offered limited, if any, credible testimony as to his income. *Page 22 
Therefore, based on the limited testimony before the Court, the Court finds the Decision of the Magistrate to be supported by such evidence."
 {¶ 74} A trial court is not required to blindly rely on a corporate tax return or blindly accept all of the expenses deducted as ordinary and necessary expenses incurred in generating gross receipts. SeeFledge, 2002-Ohio-6105, ¶ 20; Offenberg, Cuyahoga App. Nos. 78885, 78886, 79425, 79426. This is particularly true where tax returns are not signed. Id. As noted earlier, neither Peter's individual or corporate tax returns were signed by him or the public accountant. The absence of any reference to the accountant's testimony in the magistrate's decision suggests that the magistrate failed to consider her testimony. It can also suggest that the magistrate declined to give it much weight since all of the documents and financial statements prepared by the accountant were solely based upon figures provided by Peter. In either a criminal or civil case, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact, Fledge at ¶ 21; an appellate court is not in a position to second-guess a trial court on matters of credibility. See Green v. Green, Butler App. No. CA2001-07-171, 2002-Ohio-2180. In addition, the trial court's determination of Peter's income is supported by other evidence in the record. Finally, we note that under R.C. 3119.01(C)(7), the definition of "gross income" includes "self-generated income and potential cash flow from any source." Notwithstanding Peter's assertion to the contrary, we find that the cash flow created through the business account by the way Peter handles the account does not fit the definition of "nonrecurring or unsustainable income or cash flow item" under R.C. 3119.01(C)(8).
 {¶ 75} Upon thoroughly reviewing the voluminous record, and in light of all of the foregoing, we find that the trial court did not abuse its discretion in relying on Peter's deposition, rather than his 2005 individual income tax return, to determine his annual gross income, and in finding that for purposes of child support calculation, Peter's annual income is *Page 23 
$ 48,000. Although the accountant's testimony was seemingly not considered, the trial court's determination of Peter's income is supported by other evidence in the record. See Johnson v.Tataranowicz, Licking App. No. 06CA38, 2006-Ohio-6797 (finding that the trial court did not err in considering appellant's own statement of his income on a loan application as the best evidence of his income. The trial court noted that because the loan application was appellant's own application, executed by him, it should be accurate for that reason, or at the very least appellant should be held to its accuracy as he was the source of the information). Peter's fifth assignment of error is overruled.
 {¶ 76} Assignment of Error No. 6:
 {¶ 77} "THE COURT IMPROPERLY DETERMINED THE AMOUNT OF CHILD SUPPORT TO BE $ 1,726.33."
 {¶ 78} Peter's first argument challenging the trial court's failure to use his 2005 self-employed income of $ 3,459 is overruled in light of our resolution of the preceding assignment of error.
 {¶ 79} Peter next argues that the trial court erred by failing to consider and weigh all deviation factors under R.C. 3119.23. Specifically, Peter asserts that the magistrate did not consider factors relative to him such as "his advanced age 70, his declining energy, his declining income, and accumulated debt." Peter also asserts that although Sharron has shown she has spent money on Taylor, she has not shown she has spent it wisely or that it would significantly increase Taylor's living circumstances; she has failed to apply for Medicaid and other services; and the W-2 form for Sharron's husband showed an income of $ 126,257 for 2005. Peter makes other arguments that were rejected in his previous assignments of error; they will therefore not be addressed again.
 {¶ 80} R.C. 3119.22 provides that a trial court "may order an amount of child support that deviates from the amount of child support that would otherwise result from the use of the *Page 24 
basic child support schedule and the applicable worksheet, * * * if, after considering the factors and criteria set forth in [R.C.] 3119.23, the court determines that the amount calculated * * * would be unjust or inappropriate and would not be in the best interest of the child."
 {¶ 81} R.C. 3119.23, in turn, provides that the court may consider any of the following factors in determining whether to grant a deviation under R.C. 3119.23: (A) special and unusual needs of the children; (B) extraordinary obligations for minor children or obligations for handicapped children who are not step-children and who are not offspring from the marriage or relationship that is the basis of the immediate child support obligation; (C) other court-ordered payments; (D) extended parenting time or extraordinary costs associated with parenting time; (E) the obligor obtaining additional employment after a child support order is issued in order to support a second family; (F) the financial resources and the earning ability of the child; (G) disparity in income between parties or households; (H) benefits that either parent receives from remarriage or sharing living expenses with another person; (I) the amount of federal, state, and local taxes actually paid or estimated to be paid by a parent or both of the parents; (J) significant in-kind contributions from a parent, including, but not limited to, direct payment for lessons, sport equipment, schooling, or clothing; (K) the relative financial resources, other assets and resources, and needs of each parent; (L) the standard of living and circumstances of each parent and the standard of living the child would have enjoyed had the marriage continued; (M) the physical and emotional condition and needs of the child; (N) the need and capacity of the child for an education; (O) the responsibility of each parent for the support of others; and (P) any other relevant factor.
 {¶ 82} In its decision, the magistrate found that based on Peter's lack of parenting time and Sharron's expenses incurred in caring for Taylor's extraordinary needs, "it is just, appropriate, and reasonable to deviate from the actual [monthly] obligation [of $ 1,372.55] and order support in the amount of $ 1726.33 monthly." The magistrate cited *Page 25 
R.C. 3119.23(A), (D), and (M) in support of its finding. In its lengthy decision, the magistrate also addressed Taylor's needs and challenges; the costs incurred and the energy spent by Sharron in caring for Taylor and in coordinating various therapies and services on his behalf; the fact that Taylor would not do as well as he does without the intense work with therapists and his mother; and Peter's and Sharron's respective living situation and income.
 {¶ 83} Peter objected to the decision on the grounds that the magistrate failed to consider deviation factors relative to Peter; the magistrate improperly determined the child support obligation to be $ 1,726.33; and the order was against the manifest weight of the evidence. The trial court overruled the objections and found that the magistrate's decision was supported by the evidence and that Peter's testimony regarding his age, declining energy, and declining income was evasive at best. The trial court also stated: "[Peter] objects, stating that `[Peter] did not argue that none of the expenses [Sharron] incurs for Taylor's care have a demonstrable positive effect on Taylor's life.' [Peter's] objection is not well taken as the Court finds the Decision of the Magistrate to be supported by the evidence presented."
 {¶ 84} Testimony at the 2006 hearing shows that Taylor does not qualify for specific programs because Sharron's husband makes too much money; yet, to cover the cost of Taylor's expenses and needs, Sharron and her husband use credit cards, have a garage sale once a year, and have dipped into the husband's retirement several times; in fact, the husband's income for 2004 and 2005 includes money he took out of his retirement; Sharron applied to MRDD in 2003; Taylor has been on a waiting list since; there are currently 55 persons ahead of Taylor on the waiting list; Sharron has not recently applied for Medicaid because she was told Taylor would not qualify; and once Taylor qualifies for Medicaid at age 18, this will not guarantee that all medical expenses will be covered.
 {¶ 85} Testimony at the hearing also shows that in 2005 Peter and his wife took a *Page 26 
second mortgage on their house to pay for attorney fees regarding a lawsuit not related to the case at bar; they have taken money out of her retirement to pay off credit cards; according to Peter, and although he works harder, Peter's income dropped 60 percent after moving to Florida; and in the past, they have sold a property on the Turks and Caicos Island for $ 26,000-30,000 to pay off credit cards. Other than the fact that he is 70 years old and that he has to work harder in Florida than he did in Ohio, mainly because the markets are different, there was very limited testimony as to Peter's alleged decline in energy or as to his health.
 {¶ 86} Although Peter asserts they have accumulated a large amount of debt on credit cards, and despite their alleged declined income, the record also shows that Peter and his wife own three cars, including a Mercedes and a Jaguar, and a boat for which they paid over $ 3,000 for repairs, yet only used it twice in 2005; they took a cruise in 2004 and another in 2006; and Peter goes to casinos four times a year.
 {¶ 87} Upon thoroughly reviewing the record, and incorporating our analysis under the fifth assignment of error here, we find that the trial court did not abuse its discretion in ordering an upward deviation of Peter's child support obligation and in determining the amount of child support to be $ 1,726.33.[3] The record supports the trial court's reliance on the deviation factors under R.C. 3119.23(A), (D), and (M). Although not specifically referred to by the trial court, other applicable factors indirectly addressed by the magistrate and supported by the record include R.C. 3119.23(H), (K), and (L). We are mindful that the magistrate's decision did not specifically address Peter's age, and his alleged decline in energy, decline in income, and accumulated debt. Nonetheless, in light of the testimony and *Page 27 
affidavits presented by the parties, we cannot say that the trial court's decision to grant a deviation in child support for a new monthly amount of $ 1,726.33 was unreasonable, arbitrary, or unconscionable. Peter's sixth assignment of error is overruled.
 {¶ 88} Judgment affirmed in part, reversed in part, and remanded.
WALSH and POWELL, JJ., concur.
[1] Leukodystrophy is a degeneration of the white matter in the brain. Stedman's Medical Dictionary (5th Unabridged Lawyers' Ed. 1984) 780. Apraxia is a "disorder of voluntary movement, consisting in partial or complete incapacity to execute purposeful movements, notwithstanding the preservation of muscular power, sensibility, and coordination in general." Id. at 101.
[2] Evid. R. 1006 governs summaries and states: "The contents of voluminous writings * * * which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at a reasonable time and place. The court may order that they be produced in court."
[3] As noted earlier, although the trial court determined Peter's new monthly child support obligation to be $ 1,726.33, Peter was ordered to pay $ 1,317.33 effective March 1, 2005, and $ 1,292.33 effective January 1, 2006, in light of the social security benefits Taylor receives monthly as a result of Peter's retirement. *Page 1