[Cite as *Eysoldt v. ProScan Imaging*, 194 Ohio App.3d 630, 2011-Ohio-2359.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


EYSOLDT et al.,

    Appellees and
    Cross-Appellants, et al.,

    v.

PROSCAN IMAGING et al.;

GO DADDY.COM., INC.,

    Appellant and
    Cross-Appellee.

APPEAL NOS. C-100528
              C-100529
TRIAL NO.  A-0703129


*D E C I S I O N.*


Civil Appeals From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  May 18, 2011


       William M. Gustavson*,* for appellees and cross-appellants.

       Thompson Hine L.L.P., Christopher M. Bechhold, and Heather M. Hawkins, for appellant and cross-appellee.


Please note:  This case has been removed from the accelerated calendar.

DINKELACKER, Presiding Judge.

{¶1}    Defendant-appellant and cross-appellee, Go Daddy.com, Inc., appeals from a judgment entered upon jury verdicts in favor of plaintiffs-appellees and cross-appellants, Jeff Eysoldt, Mark Eysoldt, and Jill Eysoldt.  The Eysoldts appeal that part of the trial court's judgment granting Go Daddy's motion for a directed verdict on the issue of punitive damages.  We affirm the trial court's judgment.

## I.   Facts and Procedure

{¶2}    The record shows that in November 2002, Jeff Eysoldt opened account number 1165490 with Go Daddy and transferred his domain name, Eysoldt.com, into that account.  When he set up the account, he agreed to the terms of Go Daddy's domain name registration agreement, which was subsequently replaced by Go Daddy's universal terms of service agreement ("UTOS").

{¶3}    Though he could have opened multiple accounts, Jeff used account number 1165490 to register various personal and business domain names and the associated e-mail accounts.  He paid fees for those services with his credit card.  He also opened e-mail accounts for his sister, Jill, and his brother, Mark.  He helped Jill develop a website for her business, Good Karma Cookies.  He locked all his domain names, which, according to Go Daddy, meant that the only way a third party could access any of the domain names was if the third party knew Jeff's user name and password.

{¶4}    Subsequently, Jeff began a business relationship with the owners of ProScan Imaging to operate cosmetic-surgery centers called Rejuvenate Aesthetic Laser Centers ("Rejuvenate").  During the negotiations, he registered the domain name Myrejuvenate.com through his Go Daddy account.  He paid the monthly fee for the

website and its associated e-mail through an automatic monthly withdrawal from Rejuvenate's checking account.

{¶5} Ruth Wallace was ProScan's chief financial officer and a minority owner of Rejuvenate. When Rejuvenate did not perform as anticipated, the relationship between Jeff and his business partners began to sour. Jeff and his partners began negotiations to remove Jeff from the business. But they had difficulty coming to an agreement, and Jeff refused to turn the website over to Rejuvenate.

{¶6} Consequently, Wallace called Go Daddy's customer service. Daniel Baranowsky, a call-center employee, randomly answered her call. Wallace told Baranowsky that she wanted to put Myrejuvenate.com into her name. Baranowsky testified that he had been trained that when a third party asked to change a domain name, the registrant was required to request the change.

{¶7} Wallace did not know Jeff's user name or password. Baranowsky asked Wallace to validate the account by providing the last four to six digits of the method of payment for the account. Since Wallace was the chief financial officer of ProScan, she knew the last four digits of the bank account number used to pay for the Myrejuvenate.com website.

{¶8} Baranowsky testified that validating an account only meant that he, as a customer-service representative, could access the account on his computer. When Baranowsky accessed the account after speaking to Wallace, he saw a screen that showed that Jeff was the owner of account number 1165490. It also listed his address, phone number, and e-mail address.

{¶9} Jeff testified that he had contacted Go Daddy on a number of occasions because he was worried that people associated with ProScan might try to steal his account. A representative from Go Daddy had told him that no one could take his account unless that

person had his user name and password or PIN. Jeff stated that nobody but him knew the user name and password for account number 1165490. Baranowsky testified that he had looked through the log of telephone contacts during his conversation with Wallace and would have seen Jeff's contacts with Go Daddy.

{¶10} Baranowsky walked Wallace through every step that she needed to complete to take control of all of account number 1165490, including all the domain names and e-mail accounts that Jeff had paid for over the years. Baranowsky knew that he was transferring complete control of all the domain names to Wallace, even though she had only inquired about Myrejuvenate.com, and that Jeff would be completely excluded from his own account.

{¶11} Wallace was given access to Jeff's and his family's e-mail accounts. Those accounts included communications with doctors, lawyers, the Internal Revenue Service, and others. They contained medical records, credit-card numbers, bank records, and other private information.

{¶12} Jeff first learned that something was wrong when he received an e-mail from Go Daddy informing him that his account had been changed. He tried to log in and saw that he was completely excluded from the account. He immediately contacted Go Daddy, and a representative told him that if he thought that his account had been taken fraudulently, he could fill out a form called "Request for Change of Account/Email Update" and fax it, along with a copy of his driver's license, to Go Daddy.

{¶13} Jeff sent Go Daddy the form and a photocopy of his driver's license. The faxed form was readable and clearly showed his name and address. Nevertheless, Go Daddy sent him an e-mail stating that it could not identify the person pictured on the copy of the driver's license it had received. It went on to state that "our legal department requires a clear, readable copy of government-issued photo identification in order for us to make any changes

4

to an account." It told him to scan or take a digital photograph of his photo identification and e-mail it to Go Daddy. Jeff did not do so and instead filed this lawsuit.

{¶14} When Wallace discovered that Jeff and his family's websites and e-mail accounts were included in the account that Baranowsky had given her control over, she sent an e-mail to Baranowsky asking him to transfer everything but Myrejuvenate.com back to Jeff. Baranowsky did not do so. Instead, he ignored the e-mail. Go Daddy never allowed Jeff to access the account and never returned control of his and his family's websites or e-mail accounts. Since Jeff could no longer access the account, he stopped paying for it.

{¶15} The Eysoldts filed a complaint for invasion of privacy and conversion against Go Daddy. The trial court overruled Go Daddy's motion for summary judgment, and the case proceeded to a jury trial. The jury found in favor of the Eysoldts and awarded each of them compensatory damages on all their claims. It also awarded each of them punitive damages.

{¶16} Go Daddy filed motions for directed verdicts, for judgment notwithstanding the verdicts ("JNOV"), and for a new trial. The trial court granted Go Daddy's motion for a directed verdict as to the punitive damages, concluding that the evidence did not show actual malice. It overruled the motion for directed verdicts in all other respects as well as the other motions. Both parties have filed timely appeals from the trial court's judgment.

## II. Standards of Review

{¶17} In its appeal, Go Daddy presents three assignments of error for review. In its first assignment of error, it contends that the trial court erred in denying its motions for summary judgment, for directed verdicts, for JNOV, and for a new trial on the conversion and invasion-of-privacy claims. We find no merit in this assignment of error.

5

**{¶18}** An appellate court reviews a trial court's rulings on motions for summary judgment, for directed verdicts, and for JNOV de novo.[1] They involve questions of law that concern whether the evidence is legally sufficient to proceed to a jury.[2] In considering these motions, a court does not weigh the evidence or test the credibility of the witnesses.[3] Additionally, we review a ruling on a motion for a new trial under an abuse-of-discretion standard.[4]

### III. Economic-Loss Doctrine

**{¶19}** Go Daddy first argues that the Eysoldts could not recover on their claims for conversion and invasion of privacy under the economic-loss doctrine. The economic-loss doctrine generally prevents recovery of damages in tort for purely economic loss.[5] The Eysoldts argue that it applies only in negligence cases, not in cases involving intentional torts. We agree.

**{¶20}** The cases discussing the economic-loss doctrine are negligence cases.[6] The rationalization for the doctrine has its roots in negligence law. The Ohio Supreme Court has stated, "This rule stems from the recognition of a balance between tort law, designed to redress losses suffered by breach of a duty imposed by law to protect societal interests, and contract law, which holds that 'parties to a commercial transaction should remain free to govern their own affairs.' *Chemtrol* [A*dhesives, Inc. v. Am. Mfrs. Mut. Ins.*

---

[1] *Yeager v. Carpenter*, 3rd Dist. No. 14-09-19, 2010-Ohio-3675, ¶ 18; *Blair v. McDonagh*, 177 Ohio App.3d 262, 2008-Ohio-3698, 894 N.E.2d 377, ¶ 44; *Burns v. Prudential Secs., Inc.*, 167 Ohio App.3d 809, 2006-Ohio-3550, 857 N.E.2d 621, ¶ 18.

[2] *Burns* at ¶ 18.
[3] *Osler v. Lorain* (1986), 28 Ohio St.3d 345, 347, 504 N.E.2d 19; *Blair* at ¶ 46.

[4] *Blair* at ¶ 44.

[5] *Corporex Dev. & Constr. Mgt., Inc. v. Shook,* 106 Ohio St.3d 412, 2005-Ohio-5409, 835 N.E.2d 701, ¶ 6; *Trustcorp. Mtge. Co. v. Zajac*, 1st Dist. No. C-060119, 2006-Ohio-6621, ¶ 12.

[6] See, e.g., *Corporex Dev.* at ¶ 6; *Caruso v. Natl. City Mtge. Co.*, 187 Ohio App.3d 329, 2010-Ohio-1878, 931 N.E.2d 1167, ¶ 13; *Trustcorp Mtge.* at ¶ 12.

*Co.* (1989)], It went on to state, " ' 'Tort law is not designed * * * to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement." ' "[7]

**{¶21}** We find no Ohio cases specifically addressing the issue, but federal courts interpreting Ohio law have held that the economic-loss doctrine does not apply to intentional torts.[8] One of them stated that "the fundamental policy consideration underlying the economic loss rule—the inevitable absence of a duty independent of that created by a contract in a negligence action for purely economic loss—is missing in the intentional tort context, where duty is not an element of the claim."[9] Other federal courts interpreting other states' economic-loss rules have reached the same conclusion.[10] We agree with the reasoning of these courts.

**{¶22}** Go Daddy also argues that the economic-loss doctrine applies because no independent duty existed outside of the UTOS. We disagree. In overruling Go Daddy's motion for a directed verdict on this issue, the trial court stated, "[T]he tort claims here did not arise out of the agreement of the parties, but went beyond the agreement and were independent of the agreement. Since the Plaintiffs' intentional tort claims did not arise from the UTOS, the economic loss doctrine has no application." The trial court was correct. Here, the tort claims went beyond the failure to perform promises contained in the contract; they involved separate injuries.[11]

---

[7] *Corporex Dev.* at ¶ 6, quoting *Floor Craft Floor Covering, Inc. v. Parma Community Gen. Hosp. Assn.* (1990), 54 Ohio St.3d 1, 7, 560 N.E.2d 206, quoting *Sensenbrenner v. Rust, Orling & Neale, Architects, Inc.* (1988), 236 Va. 419, 425, 374 S.E.2d 55.

[8] See, e.g., *Reengineering Consultants, Ltd., v. EMC Corp.* (Jan. 14, 2009), S.D.Ohio No. 2:08-cv-47; *MyVitaNet.com v. Kowalski* (July 29, 2008), S.D.Ohio No. 2:08-cv-48.

[9] *Reengineering Consultants* at *5.

[10] See, e.g., *SMI Owen Steel Co., Inc. v. Marsh USA, Inc.* (C.A.5, 2008), 520 F.3d 432, 441-442; *Giles v. Gen. Motors Acceptance Corp.* (C.A.9, 2007), 494 F.3d 865, 875-876; *Martin v. Ford Motor Co.* (2011), 765 F. Supp.2d 673.

[11] See *Giles* at 876; *Martin*.

**{¶23}** We hold that the economic-loss doctrine does not apply in this case because the causes of actions are for intentional torts. Consequently, the trial court did not err in overruling Go Daddy's various motions on that basis.

## IV. Conversion of Intangible Property

**{¶24}** Go Daddy next argues that the trial court should have granted its motions relating to the Eysoldts' conversion claims because Ohio law does not recognize a cause of action for conversion of intangible property. At common law, the general rule was that only tangible chattels could be converted.[12] But the law has changed, and courts have held that identifiable intangible property rights can also be converted.[13]

**{¶25}** In this case, the converted property was readily identifiable. It was Jeff's account with Go Daddy and its accompanying domain names and e-mail accounts. At least one federal court has held that domain names are intangible property subject to conversion.[14] Other federal courts have held that e-mails and computer programs can be converted.[15] Consequently, we hold that the trial court did not err in submitting the conversion claims to the jury.

## V. Conversion—Ownership of the Property

**{¶26}** Next, Go Daddy contends that the trial court should have granted its motion for directed verdicts as to Mark and Jill's conversion claims because they testified that they lacked any ownership interest in or control over the account. Conversion is the wrongful exercise of dominion over property in exclusion of the owner's right, or the

---

[12] *Zacchini v. Scripps-Howard Broadcasting Co.* (1976), 47 Ohio St.2d 224, 226-227, 351 N.E.2d 454, reversed on other grounds (1977), 433 U.S. 562, 97 S.Ct. 2849.

[13] Id.; *Schafer v. RMS Realty* (2000), 138 Ohio App.3d 244, 285-286, 741 N.E.2d 155.

[14] *CRS Recovery, Inc. v. Laxton* (C.A.9, 2010), 600 F.3d 1138, 1144.

[15] *Precision Air Parts, Inc. v. Avco Corp.* (C.A.11, 1984), 736 F.2d 1499, 1501; *Meridian Fin. Advisors, Ltd. v. Pence* (May 5, 2011), S.D.Ind. No 1:07-cv-00995-LJM-TAB.

withholding of property from the owner's possession under a claim inconsistent with the owner's rights.[16]

{¶27}   While Jill and Mark acknowledged that the account was registered to Jeff, the evidence showed that each of them had e-mail accounts set up within Jeff's account. Additionally, Jeff and Jill had created content for Jill's website for her business, Good Karma Cookies. When Go Daddy gave control of the account to Wallace and ProScan, Jill could not access her website. Likewise, Jill and Mark could not access their e-mail accounts. Thus, as the trial court stated, "[T]here was sufficient evidence produced at trial that would support the jury finding that Go Daddy converted the conditional and private email communications of Mark and Jill Eysoldt that were contained in the GoDaddy account."

## VI. Invasion of Privacy

{¶28}   Finally, Go Daddy contends that the Eysoldts' invasion-of-privacy claims should have failed because they presented no evidence that Go Daddy had ever accessed or read any of their e-mails. The Eysoldts each raised an invasion-of-seclusion type of invasion-of-privacy claim. These types of claims arise when a " 'wrongful intrusion into one's private activities' " occurs " 'in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities.' "[17] To establish a claim, a plaintiff must produce evidence that the intrusion was unwarranted and offensive or objectionable to a reasonable person.[18]

---

[16] *Zacchini*, 47 Ohio St.2d at 226; *Norwell v. Cincinnati* (1999), 133 Ohio App.3d 790, 811, 729 N.E.2d 1223.

[17] *Welling v. Weinfeld*, 113 Ohio St.3d 464, 2007-Ohio-2451, 866 N.E.2d 1051, ¶ 15-16, quoting *Housh v. Peth* (1956), 165 Ohio St. 35, 133 N.E.2d 340, paragraph two of the syllabus.

[18] *Miller v. Cincinnati Children's Hosp. Med. Ctr.*, 1st Dist. No. C-050738, 2006-Ohio-3861, ¶ 16.

{¶29}   The Eysoldts did not have to prove that Go Daddy accessed their e-mails, although Jeff testified that someone had viewed his e-mails.  Go Daddy took private domain names and private e-mail accounts and turned them over to a third party who had no right to access them and who easily could have viewed their contents.  The Eysoldts testified to the distress that those intrusions caused them.  Thus, the evidence, when viewed in a light most favorable to the Eysoldts, was sufficient to send the issue to the jury.

{¶30}   In sum, we hold that the trial court did not err in overruling Go Daddy's motions for summary judgment, directed verdicts, and JNOV on the Eysoldts' claims for conversion and invasion of privacy.  Further, the court did not abuse its discretion in overruling its motion for a new trial.  We overrule Go Daddy's first assignment of error.

## VII.    Best-Evidence Rule

{¶31}   In its second assignment of error, Go Daddy argues that the trial court erred in admitting into evidence the Eysoldts' exhibit 16, which was a summary of the contents of their e-mail accounts. It argues that the admission of this exhibit violated the best-evidence rule.  This assignment of error is not well taken.

{¶32}   Evid.R. 1002 sets forth the "best evidence" or the "original document" rule.  It provides that "[t]o prove the content of a writing, recording or photograph, the original writing, recording, or photograph is required."[19]

{¶33}   But Evid.R. 1006 allows "[t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court" to be "presented in the form of a chart, summary, or calculation."  That rule also states that "the originals, or duplicates, shall be made available for examination or copying, or both,

---

[19] *Hofmeier v. Cincinnati Inst. of Plastic & Reconstructive Surgery Inc.,*(Jan. 18, 2002), 1st Dist. No. C-000274, 2002 WL 63432, *3.

by other parties at a reasonable time and place. The court may order that they be produced in court."

{¶34} Thus, for a summary to be admissible, the documents on which it was based must be admitted or offered into evidence or their absence explained.[20] Go Daddy's argument ignores the fact that at the time of trial, the e-mails were under its control. The proponents of the summary, the Eysoldts, did not have access to the e-mails. Thus the absence of the documents was adequately explained.

{¶35} Further, "[t]he original is not required, and other evidence of the contents of a writing, recording, or photograph is admissible if * * * [a]t a time when an original was under the control of the party against whom offered, that party was put on notice, by the pleadings or otherwise, that the contents would be subject of proof at the hearing, and that party does not produce the original at the hearing."[21] If Go Daddy insisted on having the originals at trial, it could have produced them.

{¶36} Go Daddy also argues that Jeff had some of the e-mails on his computer's hard drive. But Jeff had testified that his computer had "crashed" and that he had lost those e-mails. Other evidence of the contents of a writing is admissible if the originals are lost or destroyed, unless the proponent lost or destroyed them in bad faith.[22] Nothing in the record showed that Jeff had acted in bad faith.

{¶37} Even if the trial court had erred in admitting exhibit 16, the error was not prejudicial. The Eysoldts testified about the contents of their e mails and stated that those e-mails were private. An error is harmless when it "does not affect substantial rights of

---

[20] *Marder v. Marder*, 12th Dist. No. CA2007-06-069, 2008-Ohio-2500, ¶ 52.
[21] Evid.R. 1004(3).

[22] Evid.R. 1004(1).

the complaining party, or where the court's action is not inconsistent with substantial justice."[23] Consequently, we overrule Go Daddy's second assignment of error.

## VIII. Jury Demand

{¶38}   In its third assignment of error, Go Daddy contends that the trial court erred in denying is motion to strike the Eysoldts' jury demand.  It argues that under the terms of the UTOS, the Eysoldts had waived their right to a jury trial.  This assignment of error is not well taken.

{¶39}   The record shows that the Eysoldts filed a jury demand with their original complaint on April 7, 2007.  Go Daddy also demanded a jury trial in its answer to the Eysoldts' complaint.  On October 30, 2008, it filed a motion to strike the Eysoldts' jury demand.  It argued that it had included its own jury demand only because of a possible class-action suit, which did not come to pass.

{¶40}   Civ.R. 38(D) states that a jury demand "may not be withdrawn without the consent of the parties."  Once a party has demanded a jury trial, it may not withdraw its jury demand absent one of the grounds set forth in Civ.R. 39(A).[24]

{¶41}   In this case, the trial court found that Go Daddy's motion to strike was not timely filed.  It stated, "Go Daddy did not raise the issue in its Answer, and in fact Go Daddy made a Jury Demand in its Answer to the Second Amended Complaint filed March 17, 2008.  Further this case was set for a Jury Trial in the Case Scheduling Order of July 5, 2007 and again in the Amended Case Scheduling Order of April 23, 2008, without any objection by Go Daddy.  For all of those reasons, the court believes Go Daddy * * * waived the right to raise the issue."

---

[23] *O'Brien v. Angley* (1980), 63 Ohio St.2d 159, 164, 407 N.E.2d 490; *Hofmeier*, 2002-Ohio-188, at ¶ 13.
[24] *Cleveland v. Lancaster*, 2nd Dist. No. 02CA0123, 2003-Ohio-4976, ¶ 11-14.

**{¶42}** Civ.R. 39(A) does not place a time limit on the filing of a motion to strike a jury demand.[25] But we cannot hold that the trial court abused its discretion in finding that Go Daddy had waived its right to raise the issue, particularly given that it had twice filed a jury demand of its own and had repeatedly agreed to set the case for a jury trial.[26] In our view, the issue goes beyond waiver; any error in holding a jury trial was invited error.[27] Consequently, we overrule Go Daddy's third assignment of error.

### IX. Punitive Damages

**{¶43}** In their cross-appeal, the Eysoldts present one assignment of error. They contend that the trial court erred in granting Go Daddy's motion for a directed verdict on the issue of punitive damages. They argue that the evidence supported the jury's finding of actual malice. This assignment of error is not well taken.

**{¶44}** To be awarded punitive damages, the plaintiff must show actual malice.[28] "[A]ctual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm."[29]

**{¶45}** We first note that the trial court instructed the jury on only the first part of that definition. It refused to instruct the jury on the second part because it viewed that

---

[25] *Brunecz v. Houdaille Indus., Inc.* (1983), 13 Ohio App.3d 106, 107, 468 N.E.2d 370.

[26] See *Stevenson v. Prettyman*, 8th Dist. No. 94873, 2011-Ohio-718, ¶ 13; *Meyer v. United Parcel Serv., Inc.*, 174 Ohio App.3d 339, 2007-Ohio-7063, 882 N.E.2d 31, ¶ 40, reversed on other grounds, 122 Ohio St.3d 104, 2009-Ohio-2463, 909 N.E.2d 106; *Ferguson v. Strader* (1994), 94 Ohio App.3d 622, 625-627, 641 N.E.2d 728.

[27] See *Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co.* (1986), 28 Ohio St.3d 20, 502 N.E.2d 590, paragraph one of the syllabus; *Blair*, 177 Ohio App.3d 262, 2008-Ohio-3698, 894 N.E.2d 377, at ¶ 39.
[28] R.C. 2315.21(C)(1); *Blair* at ¶ 65; *Meyers v. Hot Bagels Factory, Inc.* (1999), 131 Ohio App.3d 82, 97-98, 721 N.E.2d 1068.

[29] *Blair* at ¶ 65, quoting *Preston v. Murty* (1987), 32 Ohio St.3d 334, 336, 512 N.E.2d 1174.

part of the definition as being "aimed at punishing callous conduct that was likely to cause substantial physical injury to persons." This court has applied the second part of the definition regarding "a conscious disregard" for the rights and safety of other persons in a business setting[30] and in a conversion case.[31]

**{¶46}** But while the Eysoldts argued the issue in the trial court, they have not raised it in this court. They only argue that Go Daddy's conduct satisfied the first part of the test. Consequently, they have waived the issue.[32]

**{¶47}** In granting the directed verdicts, the trial court stated, "The Court finds no evidence in the record from which actual malice could be inferred on the part of GoDaddy in this case. Plaintiffs contend that Baranowsky's conduct in failing to follow procedures when he gave Ruth Wallace access to Jeff Eysoldt's account and walked her through the steps to take control of the information in the account rise to the level of malice necessary to support the finding of punitive damages. In addition, according to Plaintiffs, doing nothing to return the account to Jeff Eysoldt demonstrates malice by GoDaddy. Those actions of GoDaddy and its employees may rise to the level of recklessness, or arguably even intentional conduct, and support the findings on the conversion and invasion of privacy claims. They do not, however, rise to the level of malice."

**{¶48}** Generally, we are reluctant to overturn a jury verdict. Also, much about Go Daddy's conduct causes us concern, particularly Baranowsky's inaction when

---

[30] See *Blair* at ¶ 66.

[31] See *R&S Dist., Inc. v. Hartge Smith Nonwovens, L.L.C.*, 1st Dist. No. C-090100, 2010-Ohio-3992, ¶ 43.

[32] *Fed. Financial Co. v. Turner*, 7th Dist. No. 05 MA 134, 2006-Ohio-7072, ¶ 13; *Nickell v. Gonzalez* (1986), 34 Ohio App.3d 364, 367, 519 N.E.2d 414.

Wallace e-mailed him and asked him to return to Jeff everything in the account but Myrejunvenate.com.

**{¶49}** Nevertheless, reckless or intentional conduct is not sufficient to justify the imposition of punitive damages. Plaintiffs must show more than the elements of an intentional tort. They must demonstrate that the "wrongdoing is particularly gross or egregious."[33] We ultimately agree with the trial court that Go Daddy's conduct was not egregious enough to rise to the level of actual malice under the first part of the definition. Consequently, the trial court did not err in granting Go Daddy's motion for directed verdicts on the issue of punitive damages, and we overrule the Eysoldts' assignment of error.

## X. Summary

**{¶50}** In sum, we find no merit in any of the assignments of error presented in the appeal or in the cross-appeal. We affirm the trial court's judgment.

Judgment affirmed.

**HILDEBRANDT** and **FISCHER, JJ.,** concur.

Please Note:

The court has recorded its own entry this date.

---

[33] *Charles R. Combs Trucking, Inc. v. Internatl. Harvester Co.* (1984), 12 Ohio St.3d 241, 466 N.E.2d 883, paragraph three of the syllabus; *Cook v. Newman Motor Sales*, 6th Dist. No. E-09-028, 2010-Ohio-2000, ¶ 40-41.