[Cite as *Hudson v. Group Health Assocs., Inc.*, 2014-Ohio-2161.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| CHARLES B. HUDSON, II, | : | APPEAL NOS. C-130164 |
| | | C-130181 |
|     Plaintiff-Appellant/Cross-Appellee, | : | TRIAL NO. A-0306507 |
| | : | *O P I N I O N.* |
| vs. | : | |
| CINCINNATI GROUP HEALTH ASSOCIATES, INC., | : | |
|   and | : | |
| CHERYLE WEBB, M.D., | : | |
|     Defendants-Appellees/Cross-Appellants, | : | |
|   and | : | |
| CHARLES BURGHER, M.D., | : | |
|     Defendant-Appellee. | : | |

Civil Appeals From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part, Reversed in Part, and Final Judgment Entered

Date of Judgment Entry on Appeal: May 21, 2014

*Marlene Penny Manes*, for Plaintiff-Appellant/Cross-Appellee,

*Calderhead, Lockemeyer & Peschke Law Office*, David C. Calderhead, Joel L. Peschke and *Joshua F. DeBra*, for Defendants-Appellees/Cross-Appellants.

Please note: this case has been removed from the accelerated calendar.

**DEWINE, Judge.**

{¶1}     This is an appeal by a patient in a medical-malpractice case. Charles Hudson's appendix burst, and he suffered severe health problems as a result. Mr. Hudson was examined by two doctors in the days leading up to his emergency appendectomy, and he contends that the complications arose from both doctors' failure to diagnose his appendicitis before the rupture. The trial court granted a directed verdict in favor of the first doctor, but permitted the claim against the second doctor to go to the jury. The jury returned a defense verdict.

{¶2}     We affirm the judgment, but on somewhat different grounds than those below. We agree with the trial court that the first doctor was entitled to a directed verdict, but conclude that a verdict should have been directed for the second doctor as well. The defect in Mr. Hudson's case was that he failed to set forth evidence of causation—he did not present any expert testimony about when the rupture occurred, and was unable to show that but for the conduct of either doctor he would not have been injured to the same extent.

### A Ruptured Appendix

{¶3}     Mr. Hudson left work on the evening of Saturday, March 9, 2002, with a sharp pain in his side. He contacted an urgent care center run by Cincinnati Group Health Associates ("CGHA") and made an appointment for the following day. Mr. Hudson was examined by Dr. Charles Burgher, the physician on duty at the clinic that day. Mr. Hudson reported abdominal pain extending from his right side to the center of his stomach, though the pain was less severe than it had been the previous night. He was also experiencing other gastrointestinal symptoms, including nausea and frequent bowel movements, and he had a fever of 100.5 degrees. Dr. Burgher conducted an

2

external examination of Mr. Hudson's abdomen and a rectal examination. Dr. Burgher concluded that Mr. Hudson had acute gastroenteritis—essentially, a stomach virus—and prescribed an anti-nausea medication. He also made a note in Mr. Hudson's chart summarizing his findings and diagnosis. Specifically, he noted that Mr. Hudson had mildly diffused abdominal tenderness, but displayed no guarding (rigidity in the muscles surrounding the abdomen), no rebound tenderness (pain when releasing pressure on the abdomen), and no tenderness on the lateral wall of the rectal cavity—all of which can indicate the presence of appendicitis. Dr. Burgher told Mr. Hudson to contact his primary care doctor if his condition did not improve.

{¶4} By Monday, March 11, Mr. Hudson's condition had not improved. His mother contacted the CGHA office of his longtime primary care physician, Dr. Cheryle Webb, and left information with the receptionist that Mr. Hudson had been seen in the urgent care clinic the previous day, had a fever of 103 degrees, and had diarrhea. She did not mention any abdominal pain. What transpired next is unclear. Dr. Webb testified that she most likely attempted to contact Mr. Hudson herself, but was unable to reach him directly. Dr. Webb also said her assistant may have attempted to contact Mr. Hudson instead. No record was made of any attempt to reach Mr. Hudson. Regardless, Dr. Webb believed she had obtained Dr. Burgher's note from the urgent care center, which would have indicated that Mr. Hudson's temperature had risen and his diarrhea had not improved, prior to ordering a prescription for an anti-diarrheal medication for him that day. Dr. Webb maintained that she did not have knowledge of Mr. Hudson's continued abdominal pain on March 11, and that had she known of the abdominal pain coupled with his 103-degree fever, she would have referred him to the emergency room.

{¶5} Mr. Hudson's condition continued to deteriorate. On the evening of Tuesday, March 12, Mr. Hudson's ex-wife stopped by to check on him. She found him

lying in bed, faint and having difficulty breathing. She immediately called 911, and Mr. Hudson was taken to the hospital by life squad. Mr. Hudson underwent an emergency surgery the following morning due to a ruptured appendix. He was hospitalized for over two months, and his recovery was fraught with complications, including brain damage resulting from low oxygen and exposure to toxins, kidney failure requiring dialysis, and septic shock.

### Defense Victories in the Trial Court

{¶6} Mr. Hudson sued Dr. Burgher, Dr. Webb, and Cincinnati Group Health Associates as their employer, alleging medical malpractice. The matter went to trial in 2010. Mr. Hudson presented the expert testimony of Dr. Glenn Hamilton, who asserted that both doctors' actions fell below the standard of care. Dr. Hamilton criticized the lack of information in Dr. Burgher's handwritten triage note, as well as Dr. Webb's failure to document any attempted calls to Mr. Hudson on March 11. He also took her to task for prescribing Lomotil, which he explained is a narcotic and can mask symptoms of pain, without speaking directly with Mr. Hudson. Dr. Hamilton testified that the failure to remove an inflamed appendix before it ruptures can lead to significant complications, since the surgical procedure is simpler and the recovery time is shorter if the appendectomy is conducted prior to the perforation of the appendix. While Dr. Hamilton indicated his belief that the transition from inflammation to rupture had occurred sometime over the course of treatment by these two doctors, he could not offer an opinion as to the specific timing of the rupture, beyond a vague comment that the "key component of the timing related to Dr. Webb."

{¶7} The defendants moved for a directed verdict at the close of Mr. Hudson's case-in-chief, contending that he had not set forth prima facie evidence of causation. The trial court granted the directed verdict in favor of Dr. Burgher, but denied the

motion as to Dr. Webb. The trial continued against Dr. Webb and resulted in a hung jury. Mr. Hudson then attempted to appeal the directed verdict in favor of Dr. Burgher, but this court dismissed the appeal for lack of a final order. *Hudson v. Cincinnati Group Health Assocs., Inc.,* 1st Dist. Hamilton No. C-100825 (October 5, 2011). A second trial was conducted in 2013, which resulted in a verdict in favor of Dr. Webb.

{¶8}     Mr. Hudson now appeals, challenging the trial court's decision granting a directed verdict in favor of Dr. Burgher in the first trial, as well as its instructions to the jury and decision to admit the testimony of a defense expert in the second trial. CGHA and Dr. Webb have cross-appealed, asserting that the trial court erred in denying Dr. Webb's motion for a directed verdict at the close of the plaintiff's case in the first trial.

## Directed-Verdict Claims

{¶9}     Because they are related, we will consider the arguments pertaining to the trial court's disposition of the defense motions for a directed verdict together. We review a decision granting a directed verdict de novo. *Eystoldt v. Proscan Imaging*, 194 Ohio App.3d 630, 2011-Ohio-2359, 957 N.E.2d 780, ¶ 18 (1st Dist.). The trial court must grant a directed verdict if, after construing the evidence most strongly in favor of the nonmoving party, it finds that reasonable minds could come to but one conclusion on any determinative issue and that conclusion is adverse to the nonmoving party. Civ.R. 50(A)(4). In ruling on a motion for a directed verdict, the trial court is not permitted to weigh the evidence or the credibility of the witnesses, but may only consider whether the evidence presented is legally sufficient to take the case to a jury. *Eystoldt* at ¶ 18.

{¶10}     To prevail on a medical malpractice claim, a plaintiff must establish: (1) the existence of a standard of care within the medical community; (2) the defendant's breach of that standard of care; and (3) an injury proximately caused by the defendant's negligence. *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 131, 346 N.E.2d 673 (1976). Mr.

5

Hudson's expert, Dr. Hamilton, testified extensively about the standards of care and the ways in which both Dr. Burgher and Dr. Webb breached those standards. Additionally, he explained that Mr. Hudson's complications and prolonged recovery were related to the more extensive surgical procedures necessitated by the ruptured appendix. Thus, our determination of the appropriateness of a directed verdict hinges on the element of causation, or in other words, whether Mr. Hudson put forth evidence that his appendix would not have ruptured and he would not have endured such severe complications had the doctors acted differently.

{¶11} As a preliminary matter, Mr. Hudson contends that the trial court inappropriately weighed the evidence before ruling on the motions for a directed verdict. The trial court did at one point state that Mr. Hudson failed to establish proximate cause "by a preponderance of the evidence." The court later clarified that its reference to the "preponderance of the evidence * * * was in regard to the fact that [it] saw no evidence on the issue of proximate cause[.]" The court further explained that it could not find any testimony "that it was likely that surgery would have occurred before Mr. Hudson's appendix ruptured had Dr. Burgher acted differently[.]" It is apparent from a full reading of the trial court's comments that the court did not weigh the evidence, but instead based its decision on the complete lack of testimony connecting Dr. Burgher's alleged negligence to Mr. Hudson's injuries. We conclude that the trial court employed the proper standard under Civ.R. 50(A)(4).

### No Evidence of Causation

{¶12} Dr. Hamilton testified that the delay in diagnosing Mr. Hudson's condition allowed the appendicitis to transition to the point of rupture, and that the transition occurred "over the course of the care of these two individuals." While he did make the nebulous statement that "the key component of the timing related to Dr.

Webb," Dr. Hamilton conceded that he was unable to say when the rupture occurred or how long the appendix had been ruptured at the time of Mr. Hudson's surgery. He did not say whether the rupture likely occurred prior to Mr. Hudson's visit to the urgent care center, after he contacted Dr. Webb, or sometime in between.

{¶13} This case is similar to *Seagle v. Scherzer*, 10th Dist. Franklin No. 00AP-1048, 2001 Ohio App. LEXIS 1974 (May 3, 2001). The plaintiff in *Seagle* alleged that her son's doctor had been negligent for failing to diagnose her son's appendicitis before his appendix ruptured. As in the present case, the plaintiff in *Seagle* put forth extensive testimony that the doctor had been negligent. The plaintiff's expert also explained that an appendectomy can result in severe complications if it is performed after the appendix has ruptured. But, just like here, the expert could not say when the rupture occurred or whether a less-invasive surgery would have been performed had the appendicitis been diagnosed sooner. Because the plaintiff presented no evidence as to whether the appendix was inflamed or perforated at the time of the doctor's negligent acts, or that the plaintiff would have required a less-serious operation had the doctor followed the standard of care, the *Seagle* court held that "there was no causal connection between the medically negligent act and the injury sustained[.]" *Id.* at \*9. In sum, the plaintiff "fail[ed] to recognize that, because her expert \* \* \* could not testify that Jeremy's appendix had not already perforated by September 4, there was no evidence that any delay in diagnosis allowed the appendix to perforate later and, thus, required the more extensive surgery on September 9." *Id.* at \*12.

{¶14} We find the analysis in *Seagle* to be persuasive. Without expert testimony about the timing of the rupture, all we have is a possibility that negligence by one or both of the doctors allowed the appendicitis to progress to the point of rupture. But "[p]roof of possibility is not sufficient to establish a fact; probability is necessary."

*Drakulich v. Indus. Comm. of Ohio*, 137 Ohio St. 82, 88, 27 N.E.2d 932 (1940). Mr. Hudson simply failed to present such proof. On this record, it is not possible to say whether the rupture occurred before Mr. Hudson visited the urgent care clinic, between that visit and the call to Dr. Webb, or after his contact with both doctors. There was no evidence that had Dr. Burgher or Dr. Webb responded in another manner, they would have caught the appendicitis before the appendix perforated, thereby reducing Mr. Hudson's risk of complications. Consequently, Mr. Hudson cannot demonstrate that he would have had fewer complications had the surgery been performed earlier.

{¶15} Where "the plaintiff's evidence on the issue of proximate cause is so meager and inconclusive that a finding of proximate cause would rest solely on speculation and conjecture, the defendant is entitled to judgment as a matter of law." *Williams v. 312 Walnut Partnership*, 1st Dist. Hamilton No. C-960368, 1996 Ohio App. LEXIS 5887, *18 (Dec. 31, 1996), citing *Renfroe v. Ashley*, 167 Ohio St. 472, 150 N.E.2d 50 (1958), syllabus; *see* Keeton, Dobbs, Keeton & Owens, *Prosser and Keeton on the Law of Torts*, Section 41, 269 (5th Ed.1984). Based on the evidence presented in this case, the jury could do no more than speculate about the timing of the rupture. Thus, no reasonable mind could conclude that the doctors' alleged breaches of the standard of care caused Mr. Hudson's injuries.

## Conclusion

{¶16} We find that the trial court properly granted the motion for directed verdict in favor of Dr. Burgher, and that the trial court erred in denying Dr. Webb's motion. Accordingly, we overrule Mr. Hudson's assignment of error as to the first trial, and we sustain GCHA's and Dr. Webb's sole assignment of error.

{¶17} Our resolution of the assignments of error pertaining to the first trial is dispositive, so we need not consider the errors alleged by Mr. Hudson from the second

trial. We affirm the trial court's judgment in part, reverse it in part, and enter judgment in favor of the defendant-appellees/cross-appellants.

Judgment affirmed in part, reversed in part, and final judgment entered.

**CUNNINGHAM, P.J.,** and **FISCHER, J.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.