SUTTON, J., delivered the opinion of the court in which KETHLEDGE, J., joined and COLE, C.J., joined in part. COLE, C.J, (pp, 481-84), delivered a separate opinion concurring in part and dissenting in part.
OPINION
SUTTON, Circuit Judge.
. A bank customarily has the right to take title to a property if the borrower fails to repay the loan used to purchase it. After the 2008 financial crisis, many banks foreclosed on many properties used to. secure the underlying loans. According to the City of Cincinnati, one financial institution based out of State (Wells Fargo) and one based out of the country (Deutsche Bank) adopted a policy of .-violating local and state property regulations when the cost of compliance outweighed the value that could be recopped through the resale of a foreclosed property. The policy, says .the City, had two consequences. One was to violate local and state public-safety laws that require owners to maintain their properties. The other was to create a common law public nuisance that lowered property tax revenues, increased, police and fire expenses, and added other administrative costs.
As this case comes to us, the parties have resolved all claims arising from any individual code violations and associated fines attached to properties named in’ the City’s complaint. The City also has resolved the .common law nuisance claims against Deutsche Bank. That leaves the common law nuisance claims against Wells Fargo, which the district court eventually rejected as a matter of law. The City appeals that ruling, and we affirm.
I.
■ The City’s complaint, several 'complaints in truth, alleged that the banks’ policy created a common law absolute and qualified public nuisance, statutory public nuisance, interference with fiduciary duty, and municipal code violations. It sought punitive and compensatory damages as well as declaratory relief. By the time it filed the third amended complaint, the one pertinent hete, the City had dropped the interference and punitive damage claims as well as the claims against some of the Deutsche Bank entities. But it still maintained claims for municipal code violations (Claims 1-4), statutory public nuisance (Claim 5), common law public nuisance (Claim 6), and declaratory relief (Claim 8) against Wells Fargo and its affiliates and some of the Deutsche Bank entities. Though the second amended complaint contained separate claims for common law public, nuisance and common law absolute public nuisance, the third amended complaint contained only the former (which apparently explains the absence of a seventh claim). In addition to challenging Wells Fargo’s practice of non-compliance, the City attached a series of exhibits naming several properties as common law and statutory nuisances as well as a number of properties with outstanding code violar tions.
*477 Developments since the City filed its third amended complaint have narrowed the dispute still further. In connection with a settlement agreement, the City stipulated to the dismissal of the rest of the Deutsche Bank entities and dismissed the claims arising from several Wells Fargo properties. Both sides agreed to dismiss the statutory nuisance claim with prejudice (Claim 5) and to stipulate to final judgment in favor of the City on the municipal code violations (Claims 1-4). The City has since disavowed any claims for injunctive and declaratory relief on appeal (Claim 8).
That leaves Claim 6: the damages claim for common law public nuisance against Wells Fargo. In rejecting this claim, the district court held that (1) the economic-loss doctrine foreclosed recovery and (2) the City’s alleged damages—increased police and fire expenses, a decrease in the City’s tax base, and an increase in the City’s administrative costs—were too attenuated to establish proximate cause. The City appealed this ruling;
II.
Under Ohio law, a common law public nuisance is “an unreasonable interference with a right common to the general public.” Kramer v. Angel’s Path, L.L.C., 174 Ohio App.3d 359, 882 N.E.2d 46, 51 (2007). Examples of such rights, from Ohio and elsewhere, include: a right of public passage (e.g., obstruction of highways); a right to use public space (e.g., pollution of fisheries); a right to navigable waterways (e.g., obstruction of public streams); a right to public health (e.g., exposure to diseased animals); a right to public safety (e.g., negligent marketing/sale of dangerous weapons); a right to public morality (e.g., houses of ill-repute); a right to public peace.(e.g., excessive noise);, and a right to public comfort (e.g., excessive odors or fumes). Restatement (Second) of Torts § 821B & cmt. a; see City of Cincinnati v. Beretta U.S.A. Corp., 95 Ohio St.3d 416, 768 N.E.2d 1136, 1142 (2002).
Ohio law recognizes two types of public nuisances; qualified and absolute. A qualified public nuisance mirrors a negligence tort, Kramer, 882 N.E.2d at 52; Beretta, 768 N.E.2d at 1143 n.4. It requires the plaintiff to show duty, breach, causation, and injury. Kramer, 882 N.E.2d at 53-54. An absolute public nuisance, sometimes called nuisance per se, comes in two forms, one.requiring.more evidence of intent (akin to an intentional tort), the other requiring less (akin to a strict liability tort). The action thus requires either the “intentional” creation of a, public nuisance or “an abnormally dangerous condition that cannot be maintained without injury to property, no matter what care is taken.” State ex rel. R.T.G., Inc. v. State, 98 Ohio St.3d 1, 780 N.E.2d 998, 1010 (2002); Kramer, 882 N.E.2d at 52.
The City’s nuisance claim has several flaws.
First, the economic-loss doctrine forecloses the City’s claim for damages for a qualified public nuisance under Ohio law. The doctrine bars tort plaintiffs; from recovering purely economic loss- that “do[esj not arise from tangible physical injury” to persons or property. Queen City Terminals v. Gen. Am. Trans., 73 Ohio St.3d 609, 653 N.E.2d 661, 667 (1995); see Corporex Dev. & Constr. Mgmt., Inc. v. Shook, 106 Ohio St.3d 412, 835 N.E.2d 701, 704 (2005). The premise of the economic-loss rule is that tort law does not impose an independent duty to avoid consequential economic damages. Queen City Terminals, 653 N.E.2d at 667; RWP, Inc. v. Fabrizi Trucking & Paving Co., No. 87382, 2006 WL 2777159, at *4 (Ohio Ct. App. Sept. 28, 2006). In the absence of such a duty, the *478 plaintiff cannot show a breach, and thus tort liability is inappropriate.
The Ohio Court of Appeals has twice invoked the economic-loss rule to reject qualified public nuisance claims like the one here. In one case, a contractor negligently severed several grounded telephone cables, causing a local business to lose service for three days. RWP, 2006 WL 2777159, at *1-2. The business filed a claim for public nuisance against the contractor, seeking damages for lost revenue. Id. at *1. The business acknowledged the economic-loss rule and acknowledged that any damages were purely economic, but it argued all the same that the rule applied only in contractual disputes. The court rejected the argument, holding that the rule barred recovery in tort as well. Id. at *4.
In the other case, the City of Cleveland alleged that JP Morgan’s lending practices created a public nuisance. City of Cleveland v. JP Morgan Chase Bank, No. 98656, 2013 WL 1183332, at *1 (Ohio Ct. App. Mar. 21, 2013). Here, too, the court held that the economic-loss rule barred recovery. Id. at *8. What happened in RWP and JP Morgan should happen here.
The City of Cincinnati demurs. It points out that RWP and JP Morgan are unreported cases and thus should hold little sway. But if the state supreme court has yet to resolve an issue, we follow state appellate court decisions, whether reported or not. See Ziegler v. IBP Hog Mkt., Inc., 249 F.3d 509, 517 (6th Cir. 2001). In 2002, what’s more, Ohio abolished the distinction between controlling and persuasive decisions based on the form of publication. Taylor Steel, Inc. v. Keeton, 417 F.3d 598, 609 (6th Cir. 2005). Having no reason to believe the Ohio Supreme Court would decide the issue differently, we apply the state law as we find it.
Second, the City’s absolute nuisance claim suffers from a different flaw. Some uncertainty, it is true, exists under Ohio law over whether the economic-loss doctrine applies to intentional torts or to absolute nuisance claims. Compare RWP, 2006 WL 2777159, at *4, with Eysoldt v. ProScan Imaging, 194 Ohio App.3d 630, 957 N.E.2d 780, 785 (2011). But we need not step into that thicket because the City’s absolute nuisance claim has a deeper failing.
The third amended complaint does not contain an absolute nuisance claim. For reasons of its own, the City removed that claim from its last amended complaint. All the complaint mentions is a “common law public nuisance,” and the section mirrors the City’s ninth claim from its second amended complaint, also labeled “Common Law Public Nuisance.” Compare R. 112 at 21-22, with R. 29 at 25. That •section of the second amended complaint, with precisely the same allegations, covered the City’s qualified nuisance claim, not its absolute nuisance claim, which appeared in a separate section labeled Claim Eight. R. 29 at 22. Most importantly for our purposes, the current claim for common law public nuisance does not contain the necessary elements for an absolute nuisance claim: It does not say the nuisance is inherently dangerous or that Wells Fargo intentionally created it. It says only that Wells Fargo “knew or should have known that they created and maintained a public nuisance.” R. 112 at 22. Knowledge does not equal intention. Absent allegations of an intentional nuisance or an inherently dangerous context, the City cannot pursue an absolute nuisance claim.
Third, even if we assume that the complaint contains qualified and absolute nuisance claims, both claims suffer from another flaw. They do not identify any Wells Fargo property that endangers pub- *479 lie health, safety, or well-being. As originally drafted, the third amended complaint referenced an exhibit (Exhibit I) identifying nine properties owned by Wells Fargo that (in the City’s view) amounted to common law public nuisances. It noted that these properties “constitute[d] the world of known common law public nuisance properties owned by either Wells Fargo or Wells Fargo, as Trastee.” R. 112 at 22. But in December of 2015, the City agreed “to delete and dismiss with prejudice all references, allegations and claims arising from or relating in any way to” certain listed Wells Fargo properties. R. 125 at 1. All nine of the properties identified as nuisances in Exhibit I are on the list. Compare R. 112-9, with R. 125 at Ex. A.
That means the complaint, as modified by the City’s stipulation, no longer identifies any nuisance properties currently owned by Wells Fargo. In view of the stipulation, the City today seeks damages only for unidentified “additional nuisance properties that will become known to the City” through discovery. R. 112 at 22. But that is not how civil litigation or for that matter nuisance law works. A plaintiff may use nuisance law only to remedy an existing nuisance, not to sue someone who may one day own (or create) a nuisance property, a category that omits no one, not least the City itself. In the absence of any factual allegations indicating why a particular property owned by Wells Fargo endangers the public, we have no way of testing the plausibility of the nuisance allegations or assessing the proximity of the City’s asserted damages. Proper pleading, even notice pleading, requires more.
The most that can be extracted from the complaint is that some of the “[n]umerous known and unknown properties” “were so deteriorated and dilapidated that they were declared public emergencies.” Id. at 13. But which properties? And which ones were not covered by the settlement? The complaint says that Exhibit I lists “the world of known common law public nuisance properties.” Id. at 22 (emphasis added). And the City dropped its claims as to all nine of those properties. An allegation about “unknown” public emergencies does not supply a plausible factual predicate for a lawsuit.
The City tries to sidestep these problems by wrapping the violations into one overarching nuisance: the “policy.” But bad intent alone does not a public nuisance make. Only where the intent (the “policy”) creates a nuisance can it be said to interfere with a public right. Wells Fargo’s intent may be relevant in determining whether it has acted negligently or intentionally in allowing a particular property to fall into a dangerous state of disrepair, but a “policy” of engaging in a cost-benefit analysis does not alone constitute a public nuisance. Many homeowners with outstanding code violations, many indeed with no violations at all, presumably have a similar policy too.
The City offers no evidence that this alleged “policy” of selective non-compliance with health and safety codes will inevitably result in a public nuisance. A dilapidated building, to be sure, has the potential to implicate the public’s rights to health and safety. But it does not become a nuisance until the dilapidation interferes with health or safety. See Ohio Rev. Code § 3767.41; see also Donley v. Boettcher, 79 Wis.2d 393, 255 N.W.2d 574, 580 (1977); Pucci v. Algiere, 106 R.I. 411, 261 A.2d 1, 10 (1970). Not every code violation results in such a condition. It follows that not every failure to comply with the code amounts to a public nuisance. Some of the code provisions concern minor (if once a week) facets of property upkeep—such as failing to mow *480 the grass—and simply do not rise to the level of interfering with public health or safety. The City admits as much by providing a long list of properties with- outstanding code violations and a short list of properties that constitute public nuisances.
Put another way, the City may not challenge Wells Fargo’s “policy” on its face because it is not tortious in all of its applications. The decision to account for costs before making repairs sometimes will create a nuisance. But sometimes it will not. It all depends on the properties, the violations, and whether the combination produces unsafe or unsanitary conditions. If the policy results in tall grass, that generally, will not create a public nuisance. If the policy results in a building on the verge of collapse, it will. The City at a minimum must connect the policy to the existence of an actual nuisance. It failed to do so.
A related problem infects the City’s efforts to plead proximate cause. Proximate cause requires “some reasonable connection between the act or omission of the defendant and the damage the plaintiff has suffered.” Queen City Terminals, 653 N.E.2d at 670. In addition to foreseeability, it requires “some direct relation” between the injury and the injurious conduct. Holmes v. Sec. Inv’r Prot. Corp., 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992); see also Bank of Am. Corp. v. City of Miami, — U.S. —, 137 S.Ct. 1296, 1305-06, 197 L.Ed.2d 678 (2017); City of Cleveland v. Ameriquest Mortg. Sec., Inc., 615 F.3d 496, 502 (6th Cir. 2010).
-The City offers the verdict that it has. “suffered damage as the .direct and proximate result of’ Wells Fargo’s nuisances but supplies .no factual allegations to support it. R. 112 at 2. The failure to tether the damages to -nuisance-related problems on Wells Fargo’s properties prevents us from assessing the “directness” of the relationship between the two. That is particularly true for the City’s attenuated theories of damage: decreased tax revenue, increased police.and fire expenditures, and increased administrative costs, R. 122 at 22-23. When tied only to a general “policy” of- non-conformance, these damages are difficult to connect to Wells Fargo’s actions and nearly impossible to disaggre-gate from other potential causes of these costs.
Making matters worse, the City has settled its municipal code violation claims. See R. 155. That presumably means it has recovered the costs of abating the nuisances on the properties listed in its complaint (in Exhibits A through I), Without knowing what conditions, or even what properties, the City now challenges as dangerous, we cannot know if the alleged damages remain.
Attempting to fill this gap, the City points to the 3,200 pages of code enforcement records attached as an exhibit to its initial complaint. But these records catalog every 'code violation issued with respect to a Wells Fargo-owned property, even properties long since sold to someone else. They do not specify which violations make Wells Fargo’s current properties a danger to the public.
The dissent to its credit recognizes that Ameriquest and JP Morgan Chase Bank dismissed similar claims for lack of causation. Infra at 483-84. But with respect it fails to follow the teachings of these cases by separating one interrelated inquiry, (absence of proximate cause) from the other (absence of pleading specifically affected properties). How can a court know whether thqre are intervening factors—say difficult-to-disaggregate damages, - apportionment concerns, or better-positioned plaintiffs, Holmes, 503 U.S. at 269-71, 273- *481 74, 112 S.Ct. 1311; Ameriquest, 615 F.3d at 503—when it does not know what properties or conditions the City challenges? The pleading and causation problems emerge from the same failing, and we cannot divide one from the other in order to conquer both. To state a cognizable claim of causation, the claimant must allege more than just a bad intent; it must identify the nuisance properties caused by that intent.
All of this does not leave Cincinnati in the cold. It has many existing tools to enforce local and state property regulations. See Ohio Rev. Code §§ 715.26, 3767.41 (providing for collection of abatement costs and statutory public nuisance claims); 6 Cincinnati Mun. Code § 1123-1— 1123-5 (creating the Vacant, Foreclosed Properties Registry). And if it thinks these means lack the heft needed to correct the problems, it has authority to improve or expand the available enforcement mechanisms, including adding punitive damages or attorney’s fees to the- damages and costs recoverable for violations. But it cannot use nuisance law to single out a particular person or entity and selectively target its holdings for additional scrutiny with the mere allegation of a cost-benefit “policy,” The City may use nuisance law to address an actual nuisance. But alleged bad intent or alleged code violations by themselves do not suffice in the absence of an unsafe or unsanitary condition associated with an identifiable property.
For these reasons, we-affirm.