RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0145p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

CITY OF CINCINNATI,

       *Plaintiff-Appellant,*

    *v.*

No. 16-3752

DEUTSCHE BANK NATIONAL TRUST COMPANY, et al.,

       *Defendants,*

WELLS FARGO BANK, N.A.; WELLS FARGO BANK,
N.A., as Trustee,

       *Defendants-Appellees.*

---

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:12-cv-00104—Sandra S. Beckwith, District Judge.

Argued: May 3, 2017

Decided and Filed: July 11, 2017

Before: COLE, Chief Judge; SUTTON and KETHLEDGE, Circuit Judges.

---

## COUNSEL

**ARGUED:** Jessica L. Powell, CITY OF CINCINNATI, Cincinnati, Ohio, for Appellant. David Dunn, HOGAN LOVELLS US LLP, New York, New York, for Appellees. **ON BRIEF:** Jessica L. Powell, Jacklyn Martin, CITY OF CINCINNATI, Cincinnati, Ohio, for Appellant. David Dunn, HOGAN LOVELLS US LLP, New York, New York, Sean Marotta, HOGAN LOVELLS US LLP, Washington, D.C., James E. Burke, KEATING MUETHING & KLEKAMP PLL, Cincinnati, Ohio, for Appellees.

    SUTTON, J., delivered the opinion of the court in which KETHLEDGE, J., joined and COLE, C.J., joined in part. COLE, C.J. (pp. 10–15), delivered a separate opinion concurring in part and dissenting in part.

---

**OPINION**

---

SUTTON, Circuit Judge.  A bank customarily has the right to take title to a property if the borrower fails to repay the loan used to purchase it.  After the 2008 financial crisis, many banks foreclosed on many properties used to secure the underlying loans.  According to the City of Cincinnati, one financial institution based out of State (Wells Fargo) and one based out of the country (Deutsche Bank) adopted a policy of violating local and state property regulations when the cost of compliance outweighed the value that could be recouped through the resale of a foreclosed property.  The policy, says the City, had two consequences.  One was to violate local and state public-safety laws that require owners to maintain their properties.  The other was to create a common law public nuisance that lowered property tax revenues, increased police and fire expenses, and added other administrative costs.

As this case comes to us, the parties have resolved all claims arising from any individual code violations and associated fines attached to properties named in the City's complaint.  The City also has resolved the common law nuisance claims against Deutsche Bank.  That leaves the common law nuisance claims against Wells Fargo, which the district court eventually rejected as a matter of law.  The City appeals that ruling, and we affirm.

I.

The City's complaint, several complaints in truth, alleged that the banks' policy created a common law absolute and qualified public nuisance, statutory public nuisance, interference with fiduciary duty, and municipal code violations.  It sought punitive and compensatory damages as well as declaratory relief.  By the time it filed the third amended complaint, the one pertinent here, the City had dropped the interference and punitive damage claims as well as the claims against some of the Deutsche Bank entities.  But it still maintained claims for municipal code violations (Claims 1–4), statutory public nuisance (Claim 5), common law public nuisance (Claim 6), and declaratory relief (Claim 8) against Wells Fargo and its affiliates and some of the Deutsche Bank entities.  Though the second amended complaint contained separate claims for

common law public nuisance and common law absolute public nuisance, the third amended complaint contained only the former (which apparently explains the absence of a seventh claim). In addition to challenging Wells Fargo's practice of non-compliance, the City attached a series of exhibits naming several properties as common law and statutory nuisances as well as a number of properties with outstanding code violations.

Developments since the City filed its third amended complaint have narrowed the dispute still further. In connection with a settlement agreement, the City stipulated to the dismissal of the rest of the Deutsche Bank entities and dismissed the claims arising from several Wells Fargo properties. Both sides agreed to dismiss the statutory nuisance claim with prejudice (Claim 5) and to stipulate to final judgment in favor of the City on the municipal code violations (Claims 1–4). The City has since disavowed any claims for injunctive and declaratory relief on appeal (Claim 8).

That leaves Claim 6: the damages claim for common law public nuisance against Wells Fargo. In rejecting this claim, the district court held that (1) the economic-loss doctrine foreclosed recovery and (2) the City's alleged damages—increased police and fire expenses, a decrease in the City's tax base, and an increase in the City's administrative costs—were too attenuated to establish proximate cause. The City appealed this ruling.

II.

Under Ohio law, a common law public nuisance is "an unreasonable interference with a right common to the general public." *Kramer v. Angel's Path, L.L.C.*, 882 N.E.2d 46, 51 (Ohio 2007). Examples of such rights, from Ohio and elsewhere, include: a right of public passage (*e.g.*, obstruction of highways); a right to use public space (*e.g.*, pollution of fisheries); a right to navigable waterways (*e.g.*, obstruction of public streams); a right to public health (*e.g.*, exposure to diseased animals); a right to public safety (*e.g.*, negligent marketing/sale of dangerous weapons); a right to public morality (*e.g.*, houses of ill-repute); a right to public peace (*e.g.*, excessive noise); and a right to public comfort (*e.g.*, excessive odors or fumes). Restatement (Second) of Torts § 821B & cmt. a; *see City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1142 (Ohio 2002).

Ohio law recognizes two types of public nuisances:  qualified and absolute.  A qualified public nuisance mirrors a negligence tort.  *Kramer*, 882 N.E.2d at 52; *Beretta*, 768 N.E.2d at 1143 n.4.  It requires the plaintiff to show duty, breach, causation, and injury.  *Kramer*, 882 N.E.2d at 53–54.  An absolute public nuisance, sometimes called nuisance per se, comes in two forms, one requiring more evidence of intent (akin to an intentional tort), the other requiring less (akin to a strict liability tort).  The action thus requires either the "intentional" creation of a public nuisance or "an abnormally dangerous condition that cannot be maintained without injury to property, no matter what care is taken."  *State ex rel. R.T.G., Inc. v. State*, 780 N.E.2d 998, 1010 (Ohio 2002); *Kramer*, 882 N.E.2d at 52.

The City's nuisance claim has several flaws.

*First*, the economic-loss doctrine forecloses the City's claim for damages for a *qualified public nuisance* under Ohio law.  The doctrine bars tort plaintiffs from recovering purely economic loss that "do[es] not arise from tangible physical injury" to persons or property.  *Queen City Terminals v. Gen. Am. Trans.*, 653 N.E.2d 661, 667 (Ohio 1995); *see Corporex Dev. & Constr. Mgmt., Inc. v. Shook*, 835 N.E.2d 701, 704 (Ohio 2005).  The premise of the economic-loss rule is that tort law does not impose an independent duty to avoid consequential economic damages.  *Queen City Terminals*, 653 N.E.2d at 667; *RWP, Inc. v. Fabrizi Trucking & Paving Co.*, No. 87382, 2006 WL 2777159, at *4 (Ohio Ct. App. Sept. 28, 2006).  In the absence of such a duty, the plaintiff cannot show a breach, and thus tort liability is inappropriate.

The Ohio Court of Appeals has twice invoked the economic-loss rule to reject qualified public nuisance claims like the one here.  In one case, a contractor negligently severed several grounded telephone cables, causing a local business to lose service for three days.  *RWP*, 2006 WL 2777159, at *1–2.  The business filed a claim for public nuisance against the contractor, seeking damages for lost revenue.  *Id.* at *1.  The business acknowledged the economic-loss rule and acknowledged that any damages were purely economic, but it argued all the same that the rule applied only in contractual disputes.  The court rejected the argument, holding that the rule barred recovery in tort as well.  *Id.* at *4.

In the other case, the City of Cleveland alleged that JP Morgan's lending practices created a public nuisance. *City of Cleveland v. JP Morgan Chase Bank*, No. 98656, 2013 WL 1183332, at *1 (Ohio Ct. App. Mar. 21, 2013). Here, too, the court held that the economic-loss rule barred recovery. *Id.* at *8. What happened in *RWP* and *JPMorgan* should happen here.

The City of Cincinnati demurs. It points out that *RWP* and *JP Morgan* are unreported cases and thus should hold little sway. But if the state supreme court has yet to resolve an issue, we follow state appellate court decisions, whether reported or not. *See Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 517 (6th Cir. 2001). In 2002, what's more, Ohio abolished the distinction between controlling and persuasive decisions based on the form of publication. *Taylor Steel, Inc. v. Keeton*, 417 F.3d 598, 609 (6th Cir. 2005). Having no reason to believe the Ohio Supreme Court would decide the issue differently, we apply the state law as we find it.

*Second*, the City's *absolute nuisance* claim suffers from a different flaw. Some uncertainty, it is true, exists under Ohio law over whether the economic-loss doctrine applies to intentional torts or to absolute nuisance claims. *Compare RWP*, 2006 WL 2777159, at *4, *with Eysoldt v. Proscan Imaging*, 957 N.E.2d 780, 785 (Ohio Ct. App. 2011). But we need not step into that thicket because the City's absolute nuisance claim has a deeper failing.

The third amended complaint does not contain an absolute nuisance claim. For reasons of its own, the City removed that claim from its last amended complaint. All the complaint mentions is a "common law public nuisance," and the section mirrors the City's ninth claim from its second amended complaint, also labeled "Common Law Public Nuisance." *Compare* R. 112 at 21–22, *with* R. 29 at 25. That section of the second amended complaint, with precisely the same allegations, covered the City's *qualified* nuisance claim, not its absolute nuisance claim, which appeared in a separate section labeled Claim Eight. R. 29 at 22. Most importantly for our purposes, the current claim for common law public nuisance does not contain the necessary elements for an absolute nuisance claim: It does not say the nuisance is inherently dangerous or that Wells Fargo intentionally created it. It says only that Wells Fargo "knew or should have known that they created and maintained a public nuisance." R. 112 at 22. Knowledge does not equal intention. Absent allegations of an intentional nuisance or an inherently dangerous context, the City cannot pursue an absolute nuisance claim.

*Third*, even if we assume that the complaint contains qualified *and* absolute nuisance claims, both claims suffer from another flaw. They do not identify any Wells Fargo property that endangers public health, safety, or well-being. As originally drafted, the third amended complaint referenced an exhibit (Exhibit I) identifying nine properties owned by Wells Fargo that (in the City's view) amounted to common law public nuisances. It noted that these properties "constitute[d] the world of known common law public nuisance properties owned by either Wells Fargo or Wells Fargo, as Trustee." R. 112 at 22. But in December of 2015, the City agreed "to delete and dismiss with prejudice all references, allegations and claims arising from or relating in any way to" certain listed Wells Fargo properties. R. 125 at 1. All nine of the properties identified as nuisances in Exhibit I are on the list. *Compare* R. 112-9, *with* R. 125 at Ex. A.

That means the complaint, as modified by the City's stipulation, no longer identifies any nuisance properties currently owned by Wells Fargo. In view of the stipulation, the City today seeks damages only for unidentified "additional nuisance properties that will become known to the City" through discovery. R. 112 at 22. But that is not how civil litigation or for that matter nuisance law works. A plaintiff may use nuisance law only to remedy an existing nuisance, not to sue someone who *may* one day own (or create) a nuisance property, a category that omits no one, not least the City itself. In the absence of any factual allegations indicating why a particular property owned by Wells Fargo endangers the public, we have no way of testing the plausibility of the nuisance allegations or assessing the proximity of the City's asserted damages. Proper pleading, even notice pleading, requires more.

The most that can be extracted from the complaint is that some of the "[n]umerous known and unknown properties" "were so deteriorated and dilapidated that they were declared public emergencies." *Id.* at 13. But which properties? And which ones were not covered by the settlement? The complaint says that Exhibit I lists "*the world* of known common law public nuisance properties." *Id.* at 22 (emphasis added). And the City dropped its claims as to all nine of those properties. An allegation about "unknown" public emergencies does not supply a plausible factual predicate for a lawsuit.

The City tries to sidestep these problems by wrapping the violations into one overarching nuisance: the "policy." But bad intent alone does not a public nuisance make. Only where the intent (the "policy") creates a nuisance can it be said to interfere with a public right. Wells Fargo's intent may be relevant in determining whether it has acted negligently or intentionally in allowing a particular property to fall into a dangerous state of disrepair, but a "policy" of engaging in a cost-benefit analysis does not alone constitute a public nuisance. Many homeowners with outstanding code violations, many indeed with no violations at all, presumably have a similar policy too.

The City offers no evidence that this alleged "policy" of selective non-compliance with health and safety codes will inevitably result in a public nuisance. A dilapidated building, to be sure, has the potential to implicate the public's rights to health and safety. But it does not become a nuisance until the dilapidation interferes with health or safety. *See* Ohio Rev. Code § 3767.41; *see also Donley v. Boettcher*, 255 N.W.2d 574, 580 (Wis. 1977); *Pucci v. Algiere*, 261 A.2d 1, 10 (R.I. 1970). Not every code violation results in such a condition. It follows that not every failure to comply with the code amounts to a public nuisance. Some of the code provisions concern minor (if once a week) facets of property upkeep—such as failing to mow the grass—and simply do not rise to the level of interfering with public health or safety. The City admits as much by providing a long list of properties with outstanding code violations and a short list of properties that constitute public nuisances.

Put another way, the City may not challenge Wells Fargo's "policy" on its face because it is not tortious in all of its applications. The decision to account for costs before making repairs sometimes will create a nuisance. But sometimes it will not. It all depends on the properties, the violations, and whether the combination produces unsafe or unsanitary conditions. If the policy results in tall grass, that generally will not create a public nuisance. If the policy results in a building on the verge of collapse, it will. The City at a minimum must connect the policy to the existence of an actual nuisance. It failed to do so.

A related problem infects the City's efforts to plead proximate cause. Proximate cause requires "some reasonable connection between the act or omission of the defendant and the damage the plaintiff has suffered." *Queen City Terminals*, 653 N.E.2d at 670. In addition to

foreseeability, it requires "some direct relation" between the injury and the injurious conduct. *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992); *see also Bank of Am. Corp. v. City of Miami*, __ U.S. __, No. 15-1111/15-1112, slip op. at 11–12 (May 1, 2017); *City of Cleveland v. Ameriquest Mortg. Sec., Inc.*, 615 F.3d 496, 502 (6th Cir. 2010).

The City offers the verdict that it has "suffered damage as the direct and proximate result of" Wells Fargo's nuisances but supplies no factual allegations to support it. R. 112 at 2. The failure to tether the damages to nuisance-related problems on Wells Fargo's properties prevents us from assessing the "directness" of the relationship between the two. That is particularly true for the City's attenuated theories of damage: decreased tax revenue, increased police and fire expenditures, and increased administrative costs. R. 122 at 22–23. When tied only to a general "policy" of non-conformance, these damages are difficult to connect to Wells Fargo's actions and nearly impossible to disaggregate from other potential causes of these costs.

Making matters worse, the City has settled its municipal code violation claims. *See* R. 155. That presumably means it has recovered the costs of abating the nuisances on the properties listed in its complaint (in Exhibits A through I). Without knowing what conditions, or even what properties, the City now challenges as dangerous, we cannot know if the alleged damages remain.

Attempting to fill this gap, the City points to the 3,200 pages of code enforcement records attached as an exhibit to its initial complaint. But these records catalog every code violation issued with respect to a Wells Fargo-owned property, even properties long since sold to someone else. They do not specify which violations make Wells Fargo's current properties a danger to the public.

The dissent to its credit recognizes that *Ameriquest* and *JP Morgan Chase Bank* dismissed similar claims for lack of causation. *Infra* at 13–14. But with respect it fails to follow the teachings of these cases by separating one interrelated inquiry (absence of proximate cause) from the other (absence of pleading specifically affected properties). How can a court know whether there are intervening factors—say difficult-to-disaggregate damages, apportionment concerns, or better-positioned plaintiffs, *Holmes*, 503 U.S. at 269–71, 273–74; *Ameriquest*,

615 F.3d at 503—when it does not know what properties or conditions the City challenges? The pleading and causation problems emerge from the same failing, and we cannot divide one from the other in order to conquer both. To state a cognizable claim of causation, the claimant must allege more than just a bad intent; it must identify the nuisance properties caused by that intent.

All of this does not leave Cincinnati in the cold. It has many existing tools to enforce local and state property regulations. *See* Ohio Rev. Code §§ 715.26, 3767.41 (providing for collection of abatement costs and statutory public nuisance claims); 6 Cincinnati Mun. Code § 1123-1–1123-5 (creating the Vacant, Foreclosed Properties Registry). And if it thinks these means lack the heft needed to correct the problems, it has authority to improve or expand the available enforcement mechanisms, including adding punitive damages or attorney's fees to the damages and costs recoverable for violations. But it cannot use nuisance law to single out a particular person or entity and selectively target its holdings for additional scrutiny with the mere allegation of a cost-benefit "policy." The City may use nuisance law to address an actual nuisance. But alleged bad intent or alleged code violations by themselves do not suffice in the absence of an unsafe or unsanitary condition associated with an identifiable property.

For these reasons, we affirm.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

COLE, Chief Judge, concurring in part and dissenting in part. I concur in the majority's conclusion that the economic-loss doctrine bars the City's qualified public nuisance claim. However, I respectfully dissent from the majority's resolution of the absolute public nuisance claim.

I.

The issue before us is whether the district court erroneously dismissed the City's third amended complaint for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). We review such dismissal de novo. *Kottmyer v. Maas*, 436 F.3d 684, 688 (6th Cir. 2006). To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see Albrecht v. Treon*, 617 F.3d 890, 893 (6th Cir. 2010) ("Courts must construe the complaint in the light most favorable to plaintiff.") (internal quotation marks omitted). A claim is facially plausible when the facts allow the court to reasonably infer that the defendant is liable for the alleged wrongdoing. *Iqbal*, 556 U.S. at 678. While "detailed factual allegations" are unnecessary, "facts that are 'merely consistent with' a defendant's liability" are insufficient. *Id.* (quoting *Twombly*, 550 U.S. at 555, 557). So too are "[t]hreadbare recitals" of the elements of the claim, supported by "conclusory statements" alone. *Id.*

As the majority acknowledges, an absolute public nuisance is 1) the intentional creation of a public nuisance, which is an unreasonable interference with a right common to the general public or 2) an abnormally dangerous condition bound to injure property. Maj. Op. 3–4 (citing rights to public safety and health as examples of rights common to the general public). The City's complaint alleges that Wells Fargo has created an absolute public nuisance by deliberately leaving its many foreclosed properties vacant, unsound, or decrepit, which has led to numerous safety hazards, crime, and the diversion of scarce public resources. (Third Am. Compl., R. 112,

PageID 8202, 8206, 8208, 8210–12, 8218–20.)  These allegations meet both definitions of an absolute public nuisance.

The parties agree that to plead an absolute public nuisance claim adequately, the City's complaint must also allege facts that, if established, would show that Wells Fargo's management of its foreclosed properties proximately caused the City's asserted injuries.  "Although not the sole element, the requirement of a direct injury is a 'central element' of proximate cause." *City of Cleveland v. Ameriquest Mortg. Sec., Inc.*, 615 F.3d 496, 502 (6th Cir. 2010) (quoting *Perry v. Am. Tobacco Co.*, 324 F.3d 845, 848 (6th Cir. 2003)).

The Ohio Supreme Court has adopted the U.S. Supreme Court's method for determining whether alleged misconduct directly caused an asserted injury.  *City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1148–49 (Ohio 2002) (applying the factors detailed in *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 269–70 (1992)).  Under this approach, courts consider 1) whether there are intervening factors between the stated wrongdoing and injury, 2) the difficulty of determining the extent to which any damages stemmed from the wrongdoing as opposed to entirely other factors, 3) whether the court would have to apportion the damages among different plaintiffs to avoid multiple full recoveries, and 4) the availability of directly injured parties better positioned to sue.  *See Holmes*, 503 U.S. at 269–71, 273–74.  Courts need not decide that every factor applies to conclude that the connection between a defendant's alleged misconduct and plaintiff's asserted injury is too remote for recovery.  *See, e.g., Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458–61 (2006) (holding that plaintiff's claim failed to "satisfy the requirement of proximate causation" "[n]otwithstanding the lack of any appreciable risk of duplicative recoveries").

We conducted the directness inquiry adopted by the Ohio Supreme Court in *Ameriquest*. There, the city of Cleveland alleged that financial entities created a qualified public nuisance by financing subprime loans that caused a foreclosure crisis.  *Ameriquest*, 615 F.3d at 498–99. Cleveland alleged essentially the same injuries as the City, including numerous safety hazards generating maintenance and demolition costs.  *Id.* at 499.  We affirmed the dismissal of the qualified public nuisance claim on proximate cause grounds, observing that "[h]omeowners . . .

were responsible for maintaining their properties" and the availability of more immediate victims, including those who had suffered foreclosure. *Id.* at 504–07.

At least some of the City's allegations in its third amended complaint significantly differ from Cleveland's and adequately plead proximate cause. Here, unlike in *Ameriquest*, the defendant owns the dilapidated foreclosed properties. Thus, there are no intervening factors between its alleged failure to maintain the properties and the costs of repeated municipal inspections for safety hazards, clean-up and utilities expenses incurred to prevent further hazards, and the costs of barricading or demolishing irreparable homes. (*See* Third Am. Compl., R. 112, PageID 8211–12, 8214, 8216, 8218–20.) Further, a lower court could easily trace these damages to Wells Fargo and award them to the City without worrying about apportionment among different plaintiffs. Finally, the City is not only best positioned to pursue these damages; it is the only entity that could. For these reasons, the City adequately pleads proximate cause as to the above injuries under its absolute public nuisance claim.

The majority concludes that the City has altogether dropped its absolute public nuisance claim. Maj. Op. 5. The majority reasons that the City's second amended complaint contains a "common law public nuisance" claim and a "common law absolute public nuisance" claim whereas its third amended complaint contains only the former. *Id.* at 2–3, 5. (*Compare* Second Am. Compl., R. 29, PageID 5333–36, *with* Third Am. Compl., R. 112, PageID 8218–20.) This analysis suffers two infirmities.

First, claim six of the third amended complaint sets forth a claim for a "common law public nuisance," which encompasses both an absolute and qualified public nuisance claim, not a common law *qualified* public nuisance. (Third Am. Compl., R. 112, PageID 8218.) More importantly, the third amended complaint meets both definitions of an absolute public nuisance and the proximate cause requirement. (*See id.* at 8202, 8208, 8210–12, 8216, 8218–20 (offering Wells Fargo's intentional "fail[ure] to take responsibility for the . . . upkeep of [its] properties," such as "fail[ing] to properly secure" them and rendering them "uninhabitable," which requires the City to continually inspect, maintain, and demolish the properties, as deliberate interference with public safety and an abnormally dangerous condition harming property).)

Second, Wells Fargo never disputed (until oral argument) that the City's third amended complaint incorporates the former complaint. *See, e.g.,* Def.'s Br. 3 n.1 ("[G]iven the case's procedural posture, we relate disputed facts as the City has alleged them in its second and third amended complaints."). (*See* Third Am. Compl., R. 112, PageID 8220 ("The City restates its *claims* for damages . . . for Defendants' common law public nuisance properties.") (emphasis added).)

The majority affirms the dismissal of the City's absolute public nuisance claim on a separate, equally flawed basis: the City has not identified the specific properties causing it harm. Maj. Op. 6. This ignores the City's exhibits D, F, and H, which reference properties "so deteriorated and dilapidated that they were declared public emergencies"; the over 3,000 pages of code enforcement records citing properties threatening public health and safety; and Wells Fargo's admission that the City's allegations continue to apply to nineteen specific properties. (*See* Third Am. Compl., R. 112, PageID 8200, 8207, 8210–11, 8216; *see, e.g.,* Code Enforcement, R. 14-3, PageID 3860 (finding 6611 Vine St. with an "electrical service cable . . . hanging loosely from the building," which "poses a serious threat to the life [sic] safety of anyone around"); Code Enforcement, R. 15-1, PageID 4037 (noting 3907 W. Liberty St. "has a hazardous failing foundation," "deteriorated materials," and "broken windows"); Code Enforcement, R. 15-3, PageID 4328 (finding 2768 Queen City "poses a serious threat to anyone who may be in or around it" and "is likely to . . . collapse"); Code Enforcement, R. 16-1, PageID 4541 (noting 1733 Westwood Avenue "has been vacant for at least two years," is "a vandalized dilapidated structure," and thus "indecent, unsafe and insanitary [sic] for human habitation").)

The City's third amended complaint also recounts the frequency with which banks acquire and dispose of properties, and the lag between such acquisitions and dispositions and recording with the Hamilton County Auditor. (*See id.* at 8207–08.)

Additionally, and of even more importance, the notion that proper pleading—even notice pleading—requires the City to identify specific properties to survive a Rule 12(b)(6) motion has no basis in law. *Contra* Maj. Op. 6–7; *cf. Ameriquest*, 615 F.3d at 506–07 (affirming dismissal of complaint under federal pleading standards for failure to meet proximate cause requirement rather than the omission of specific properties); *City of Cleveland v. J.P. Morgan Chase Bank,*

*N.A.*, No. 98656, 2013 WL 1183332, at \*3–6, \*8 (Ohio Ct. App. Mar. 21, 2013) (affirming dismissal of similar complaint under notice pleading standards for failure to meet proximate cause requirement and because the economic-loss doctrine barred damages rather than the omission of specific properties). At oral argument, Wells Fargo conceded that no court has required such specificity in a complaint. Wells Fargo itself never raised the City's purported failure to delineate properties in its complaint.

The City's allegations that Wells Fargo deliberately leaves its many foreclosed properties vacant, unsound, and decrepit, which forces the City continuously to inspect, tend, barricade and raze them, are worlds apart from the "[t]hreadbare recitals" and "conclusory statements" insufficient to survive a motion to dismiss. *Iqbal*, 556 U.S. at 678; *see Courtright v. City of Battle Creek*, 839 F.3d 513, 520 (6th Cir. 2016) (construing allegation that plaintiff "suffered injuries" because of "[d]efendants' unlawful actions" as a threadbare recital of an element of an excessive force claim). (Third Am. Compl., R. 112, PageID 8202, 8206, 8208, 8210–12, 8214, 8216, 8218–20.) Questions about which properties have caused which damages (if any) are more suited for discovery. As such, the City's third amended complaint states a claim for relief that is clearly plausible on its face.

## II.

The final question is whether the economic-loss doctrine applies to absolute public nuisance claims. The Supreme Court of Ohio has not addressed this question. At least two Ohio courts of appeals, however, have recognized that the rule excludes all intentional torts. *Ineos USA L.L.C. v. Furmanite Am., Inc.*, No. 1-14-06, 2014 WL 5803042, at \*6 (Ohio Ct. App. Nov. 10, 2014); *Eysoldt v. ProScan Imaging*, 957 N.E.2d 780, 785 (Ohio Ct. App. 2011); *see Angerman v. Burick*, No. 02CA0028, 2003 WL 1524505, at \*2 (Ohio Ct. App. Mar. 26, 2003) (identifying absolute nuisance as an intentional tort).

In arguing that Ohio courts of appeals have held that "the economic-loss doctrine applies to nuisance claims," Wells Fargo conflates absolute and qualified public nuisances. Def.'s Br. 14–15 (citing *RWP, Inc. v. Fabrizi Trucking & Paving Co., Inc.*, No. 87382, 2006 WL 2777159, at \*4 (Ohio Ct. App. Sept. 28, 2006) and *J.P. Morgan*, 2013 WL 1183332, at \*8, both of which

involved qualified public nuisance claims). *RWP* suggests, to the contrary, that the economic-loss doctrine *excludes* absolute public nuisance claims. 2006 WL 2777159, at *4 (denying plaintiffs could evade the doctrine by alleging an absolute rather than qualified public nuisance, not because both claims are subject to the doctrine, but because plaintiffs had not sustained the injury needed for an absolute public nuisance claim). I agree that, in Ohio, the doctrine does not apply to absolute public nuisance claims. Accordingly, the City's third amended complaint sufficiently pleads a claim for absolute public nuisance.

For these reasons, I respectfully concur in part and dissent in part.